**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO: _____

KEVIN DOUGHERTY, an individual,

      Plaintiff,

v.

JOHN TOTSCH, an individual; RICHARD TOTSCH,
an individual; TERRY RICHARS, an individual;
MUELLER PROST, PC a Missouri professional
corporation; WIPFLI FINANCIAL ADVISORS, LLP,
a Wisconsin limited liability partnership;  GRANT
COLE CPA, LLC, a Missouri limited liability company;
SHORT TERM LENDING SOLUTIONS, LLC, a
Missouri limited liability company; CURTIS NEAL
FOSTER, an individual; INTENSE FISHING, LLC, an
Alabama limited liability company; FOSTER'S
MARINE, LLC, an Alabama limited liability company;
and RUBICON PRODUCTS LLC, a Missouri limited
liability company;

      Defendants.

_____/

## **COMPLAINT**

      COMES NOW, Plaintiff, KEVIN DOUGHERTY ("Plaintiff" or "Dougherty"), and sues

individual Defendants JOHN TOTSCH ("John"), RICHARD TOTSCH ("R. Totsch"), TERRY

RICHARS, CPA ("Richars"), MUELLER PROST, PC, a Missouri limited liability company

("Mueller Prost"),  WIPFLI LLP, a Wisconsin limited liability partnership ("Wipfli");  GRANT

COLE CPA, LLC a Missouri limited liability company ("Grant Cole"); SHORT TERM LENDING

SOLUTIONS, LLC, a Missouri limited liability company ("Short Term Lending"); CURTIS NEAL

FOSTER ("Foster"), INTENSE FISHING LLC, an Alabama limited liability company ("Intense

Fishing"); FOSTER'S MARINE, LLC, an Alabama limited liability company; ("Foster's Marine");

RUBICON PRODUCTS LLC, a Missouri limited liability company ("Rubicon"), and hereby alleges

as follows:

## JURISDICTION AND VENUE

1.      This is a civil action for damages of more than $75,000.00, exclusive of attorney's fees, professional fees, costs, and interest.

2.      This Court has jurisdiction over the subject matter of the causes of action in this Complaint by virtue of:

      a.   Federal question jurisdiction pursuant to 28 U.S.C. § 1331, involving an action pursuant to 18 U.S.C. §§ 1964(a) and (c), the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO");

      b.   Subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, specifically, diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), involving an action between citizens of a State and citizens or subjects of a foreign State;

      c.   Supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), involving claims that are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(2) and (3)  as specifically alleged hereinbelow as to each Defendant listed in the subheading "Parties", *infra*.

4.      Defendants JOHN TOTSCH, RICHARD TOTSCH, TERRY RICHARS, MUELLER PROST PC (its successors and assigns in interest), SHORT TERM LENDING, and CURTIS NEAL FOSTER are alleged to have violated 18 U.S.C. §§ 1964(a) and (c), and, thus, Venue is proper within this district pursuant to 18 U.S.C. § 1965(a) as it relates to transacting their affairs and/or 18 U.S.C. § 1965(b).

## **PARTIES**

5.      Dougherty is an individual and resident of Martin County, Florida and is otherwise *sui juris*.

6.      Defendant JOHN TOTSCH ("John") is an individual and resident of Jefferson County, Missouri, and is otherwise *sui juris*. Defendant John is subject to personal jurisdiction in the State of Florida and in this Court pursuant to Fla. Stat. § 48.193(1)(a), specifically enumerated acts 1, 2, 6a and 7.  Additionally, this Defendant is subject to  jurisdiction pursuant to Fla. Stat. § 48.193(2) in that he conducts substantial and not isolated business within this jurisdiction and otherwise has sufficient contacts upon which to support personal jurisdiction. More specifically related to Fla. Stat. § 48.193(1)a enumerated act 2, this Defendant also committed tort(s) within the State of Florida through the use of written communications, telephonic communications directed to the State of Florida.[1] Finally, jurisdiction is proper pursuant to 18 USC § 1965.

7.      Defendant RICHARD TOTSCH ("R. Totsch") is an individual and resident of St. Louis County, Missouri, and is otherwise *sui juris*.  Defendant R. Totsch is subject to personal jurisdiction in the State of Florida and in this Court pursuant to Fla. Stat. § 48.193(1)(a), specifically enumerated acts 1, 2, 6a and 7.  Additionally, this Defendant is subject to jurisdiction pursuant to Fla. Stat. § 48.193(2) in that he conducts substantial and not isolated business within this jurisdiction and otherwise has sufficient contacts upon which to support personal jurisdiction. More specifically related to Fla. Stat. § 48.193(1)a, enumerated act 2, this Defendant also committed tort(s) within the State of Florida through the use of written communications, telephonic communications directed to the State of Florida. *See* FN 1. Finally, jurisdiction is proper pursuant to 18 USC § 1965.

---

[1] *See Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002) ("telephonic, electronic, or written communications into Florida may form the basis for personal jurisdiction under section 48.193(1)(b) if the alleged cause of action arises from the communications.").

8.      Defendant TERRY RICHARS ("Richars") is an individual and resident of St. Louis, Missouri and is otherwise *sui juris.*  Defendant Richars is subject to personal jurisdiction in the State of Florida and in this Court pursuant to Fla. Stat. § 48.193(1)(a), specifically enumerated acts 1, 2, 6a and 7.  Additionally, this Defendant is subject to jurisdiction pursuant to Fla. Stat. § 48.193(2) in that he conducts substantial and not isolated business within this jurisdiction and otherwise has sufficient contacts upon which to support personal jurisdiction. More specifically related to Fla. Stat. § 48.193(1)a, enumerated act 2, this Defendant also committed tort(s) within the State of Florida through the use of written communications, telephonic communications directed to the State of Florida. *See* FN 1. Finally, jurisdiction is proper pursuant to 18 USC § 1965.

9.      Defendant MUELLER PROST PC ("Mueller Prost"), its successors in interest, is a Missouri professional corporation and accounting firm with a principal place of business located in St. Louis County, Missouri.   Pursuant to Fla. Stat. § 48.193(1)a, enumerated act 2, this Defendant committed tort(s) within the State of Florida through the use of written communications, telephonic communications directed to the State of Florida. *See* FN 1. Personal jurisdiction is also based upon Fla. Stat. § 48.193(1)a, enumerated act 1.  Finally, jurisdiction is proper pursuant to 18 USC § 1965.

10.      Defendant WIPFLI FINANCIAL ADVISORS LLP ("Wipfli") is a Wisconsin limited liability partnership with a principal place of business located in Wassau, Wisconsin.  Defendant Wipfli acquired, merged and/or absorbed Defendant Mueller Prost in or about June 2021.  Wipfli as the successor in interest to Defendant Mueller Prost by merger and is liable for damages as respondent superior a consequence of the tortious acts alleged herein and committed in the State of Florida.

11.      Defendant GRANT COLE CPA LLC ("Grant Cole") is a Missouri limited liability company with a principal place of business located in St. Louis County, Missouri.  Pursuant to Fla. Stat. § 48.193(1)a, enumerated act 2, this Defendant committed tort(s) within the State of Florida through the use of written communications, telephonic communications directed to the State of

Florida. *See* FN 1. Personal jurisdiction is also based upon Fla. Stat. § 48.193(1)a, enumerated act 1. Finally, jurisdiction is proper pursuant to 18 USC § 1965.

12.     Defendant SHORT TERM LENDING SOLUTIONS LLC ("Short Term Lending") is a Missouri limited liability company with a principal place of business located in St. Louis, Missouri. Pursuant to Fla. Stat. § 48.193(1)a, enumerated act 2, this Defendant committed tort(s) within the State of Florida through the use of written and telephonic communications directed to the State of Florida. *See* FN 1. Personal jurisdiction is also based upon Fla. Stat. § 48.193(1)a, enumerated act 1. Finally, jurisdiction is proper pursuant to 18 USC § 1965.

13.     Defendant CURTIS NEAL FOSTER ("Foster") is an individual and resident of Mobile, County, Alabama and is otherwise *sui juris*.  Defendant Foster is subject to personal jurisdiction in the State of Florida and in this Court pursuant to Fla. Stat. § 48.193(1)(a), specifically enumerated acts 1, 2, 6a and 7.  Additionally, this Defendant is subject to jurisdiction pursuant to Fla. Stat. § 48.193(2) in that he conducts substantial and not isolated business within this jurisdiction and otherwise has sufficient contacts upon which to support personal jurisdiction. More specifically related to Fla. Stat. § 48.193(1)a, enumerated act 2, this Defendant also committed tort(s) within the State of Florida through the use of written communications, telephonic communications directed to the State of Florida. *See* FN 1. Finally, jurisdiction is proper pursuant to 18 USC § 1965.

14.     Defendant INTENSE FISHING LLC ("Intense Fishing") is an Alabama limited liability company with a principal place of business located in Mobile, Alabama. This Defendant is subject to jurisdiction pursuant to Fla. Stat. § 48.193(2) in that it conducts substantial and not isolated business within this jurisdiction and otherwise has sufficient contacts upon which to support personal jurisdiction.  Pursuant to Fla. Stat. § 48.193(1)a, enumerated act 2, this Defendant also committed tort(s) within the State of Florida through the use of written communications, telephonic

communications directed to the State of Florida. *See* FN 1. Finally, jurisdiction is proper pursuant to 18 USC § 1965.

15.     Defendant FOSTER'S MARINE LLC ("Foster's Marine") is an Alabama limited liability company with a principal place of business located in Mobile, Alabama.  This Defendant is subject to jurisdiction pursuant to Fla. Stat. § 48.193(2) in that it conducts substantial and not isolated business within this jurisdiction and otherwise has sufficient contacts upon which to support personal jurisdiction.   Pursuant to Fla. Stat. § 48.193(1)a, enumerated act 2, this Defendant also committed tort(s) within the State of Florida through the use of written communications, telephonic communications directed to the State of Florida. *See* FN 1. Finally, jurisdiction is proper pursuant to 18 USC § 1965.

16.     Defendant RUBICON PRODUCTS LLC ("Rubicon") is a Missouri limited liability company with its principal place of business located in St. Louis County, Missouri and purports to have a business location in Jefferson County, Missouri. This Defendant is subject to personal jurisdiction pursuant to Fla. Stat. § 48.193(2) as it is alleged herein that Defendant engages in substantial and not isolated activities within the State of Florida and otherwise has sufficient contacts within this jurisdiction upon which to support personal jurisdiction.  Finally, jurisdiction is proper pursuant to 18 USC § 1965.

## <u>GENERAL ALLEGATIONS</u>

17.     For 32 Years,  Dougherty served his community as a police officer finishing out his career as a decorated Sargent with the Miami-Dade Police Department ("MDPD").

18.     During his career, Dougherty also was tasked with sourcing state-of-the-art video surveillance equipment that could be viewed remotely, even in low light conditions to apprehend criminals with evidence that could support convictions. Dougherty also had patrol assignments with

the Miami-Dade Police Marine Unit where he learned to operate low light night vision devices and also became aware of their limitations/design defects such as fogging.

## 1997 - 2013 – BACKGROUND BETWEEN DOUGHERTY AND DEFENDANT JOHN

19.     In or about 1997, Dougherty was introduced to Defendant John through a mutual acquaintance who was a United States Marshal.

20.     At that time in 1997, Defendant John was one of three purported owners of Northern Telepresence, LLC ("Northern Telepresence"), a Vermont limited liability company started in the early 1990s.  In 1997, Northern Telepresence created and manufactured state-of-the-art remote video camaras that installed to avoid detection of would-be criminals.

21.     Northern Telepresence's flagship product was called the "Sentinel", a video recording device that could be used for up to thirty days without having to replace its battery.

22.     Based upon Dougherty and Defendant John's communications regarding Northern Telepresence's capabilities to produce proven law enforcement tools, Dougherty and Defendant John began to develop both a personal and business relationship.

### *Dougherty "invests" in Northern Telepresence*

23.     In or about 1998, Dougherty approached Defendant John and inquired if there was an opportunity to invest in Northern Telepresence.

24.     Defendant John responded stating that Dougherty could "invest" in the company which he said would be an excellent investment.  Dougherty paid John $6,000.00 for three shares.

25.     In 2011, Dougherty purchased more stock yet never received any yearly dividends and the company collapsed in 2013.

26.     In 2013, Defendant John stated to Dougherty that he had been brainstorming about the development of a "new" product.  Then, after his previous company fell apart, John said that he

planned to start a new company which would become Rubicon and live with his brother, Defendant R. Totsch in Missouri.

27.     During these discussions in mid to late 2012, John's represented to Dougherty that he could be his partner, but that he needed money to make the move and asked Dougherty to front him moving expenses which he did in reliance upon John's representations.

28.     This reliance was reasonable because it was based on their 15-year relationship which was founded upon false claims that Defendant John knew how to run a business to make money.

**THE FORMATION OF THE RUBICON PARTNERSHIP**

29.     In late 2013, Dougherty began to fund both Rubicon's startup costs.

30.     During several conversations regarding such funding at this time in late 2013, Defendant John promised that Dougherty would be paid back for everything in full through Rubicon once it got off the ground.

31.     In late 2013, Defendant John, with the direct or indirect imputed knowledge of Defendant R. Totsch, began to request funds from Dougherty specifically for research and development of the Original Rubicon Prototype ("Original Rubicon Prototype").

32.     From late 2013 through early 2014, Dougherty agreed to Defendant John's monetary requests for the development of the Original Rubicon Prototype which exceeded $20,000.00 over the course of five months.

33.     In late 2013, Dougherty and Defendant John worked in tandem to develop and build the Original Rubicon Prototype.

34.     For his part, Dougherty's contributed his first-hand experience derived from his "marine patrol" assignments while working at the MDPD which allowed him to identify flaws with current night vision cameras and to make recommendations to avoid design errors.

35.     More specifically, the then available cameras distorted the operator's field of vision and depth perception which presented life-threatening conditions.

36.     Between late 2013 and January 2014, Defendant John, with Dougherty's contributions, had constructed the Original Rubicon Prototype.   The Original Rubicon Prototype was essentially an "erector-set" like chassis with the lens, sensors and other electronics attached to a one-inch by six-inch piece of lumber.

37.     While the Original Rubicon Prototype had an extremely rudimentary construction, when Dougherty first tested it, the device was able to perform in night-like conditions.

38.     During the time of the prototype testing, construction and development from late 2013 through early 2014, Dougherty continued to make transfers of his money by either United States Mail or by wire transfer based upon John's false representations made over interstate wires as to repayment for same in violation of 18 U.S.C. § 1343.

39.     From late 2013 through April 2014, upon information and belief, neither Defendant John nor Defendant R. Totsch kept any formal books and records to account for the receipt of Dougherty's funds.

40.     Upon information and belief, Defendant R. Totsch did not contribute any funds or provide any expertise towards the furtherance of the new business venture or the development of the prototype.

### *Defendant John and Dougherty become "Formal" "60/40" Partners in Rubicon*

41.     In late 2013 or early 2014, John and Dougherty agreed to become "formal" partners in Rubicon through a series of interstate phone calls and emails where Dougherty was told that they would have a "60/40" partnership, with Dougherty owning 40% of Rubicon based upon his monetary contributions through early 2014 which amounted to approximaly $20,000.

42.     At some point in late 2013, before disclosing the same to Dougherty, Defendant John promised his brother a membership interest in Rubicon which had yet to be registered as a corporate entity.

43.     Defendant John stated to Dougherty that Defendant R. Totsch would be a "passive" and "silent" partner/member.

44.     Far from being a "silent" partner of Rubicon, in January 2014, Defendant R. Totsch, without Dougherty's knowledge or approval and before Rubicon was registered as a corporation, posted, and remains posted to present date, over interstate wires and servers via his LinkedIn profile that he is Rubicon's Vice President of Sales/Marketing, that Rubicon was a "family owned" business and that he was "developing dealer and distributor networks and marketing [Rubicon] products to a variety of industries."

45.     Specifically, Defendant R. Totsch's LinkedIn profile stated and continues to make these false statements over interstate wires, claiming he was or is the Vice President of Sales and Marketing, yet, in reality, he did nothing of the sort.

46.     As officers of Rubicon from 2014 through 2022, Defendant R. Totsch had direct and/or indirect imputed knowledge of Defendant John's conduct and activities related to Rubicon.

### *Defendant John Demands More Money from Dougherty for his "Buy In"*

47.     Subsequent to their discussions and "agreement" in early 2014 relative to becoming "60/40" partners, sometime just prior to Rubicon's official corporate filing in April 2014, Defendant John contacted Dougherty, with the direct, indirect or imputed knowledge of Defendant R. Totsch as "co-founder," member and "vice president" of Rubicon, over interstate telephone wires and fraudulently demanded another $40,000.00 for his alleged 40% equity membership interest in the company, purportedly because the company needed more money before its official registration to pay for expenses which he had no money to contribute.

48.     This was in addition to the over $20,000.00 Dougherty had already "invested" in the Rubicon business venture to be a "formal" 40% partner in Rubicon.   At the time Defendant John demanded the additional $40,000.00 from Dougherty over interstate wires, he knew he had no intention of Dougherty ever being repaid for his monetary contributions to Rubicon or his personal expenses.

49.     John's main schemes to defraud Dougherty would prevent him from fully discovering the nature and extent of his fraudulent conduct until approximately January 2022.

50.     One of his principal fraudulent schemes was a "policy" that Rubicon would not repay certain company debts, such as those owed to Dougherty, unless the company had sufficient "cash flow" as determined by Defendant John in his sole discretion.   However, Defendant John never had any intention of Dougherty being repaid for anything he contributed to Rubicon in that Dougherty was never repaid for the funds he personally transferred to Rubicon based upon John's fraudulent representations.

51.     Another scheme involved John's directive that no profit distributions would be made to the Rubicon members unless and until Rubicon had three months of reserves for payment of its regular business obligations, which of course, included his salary.   Defendant John intentionally used this scheme to fraudulently deprive Dougherty of profit distributions.

52.     At or about April 2014, Dougherty transferred $40,000.00 to Defendant John, with the direct, indirect or imputed knowledge of Defendant R. Totsch as "co-founder," member and "vice president" of Rubicon.

**RUBICON'S FORMATION THROUGH R&D - 2014-2016**

53.     On or about April 21, 2014, Defendant John, with the direct, indirect or imputed knowledge of Defendant R. Totsch as "co-founder," member and "vice president" of Rubicon,

electronically filed over interstate wires Original Articles of Incorporation for Defendant Rubicon which contained false information.

54.     From April 2014 and at all times material hereto, Defendant John maintained primary control over the Rubicon bank account.

55.     Additionally, upon Rubicon's Original Articles of Incorporation filing in April 2014, without much discussion on the matter, Defendant John began to distribute himself a salary of $850.00 per week ($44,000.00 per year).

56.     From April 2014 through 2016, Dougherty's substantial ongoing financial contributions paid for Defendant John's salary, his personal expenses, Rubicon's office space, the Research and Development of Rubicon's prototype, marketing materials and other incidentals.

57.     From April 14, 2014, and over the next approximately 18 months, through December 2015, Dougherty and Defendant John began to work on evolving the Original Rubicon Prototype into a production level/sales ready device which would be called the "Nite Track."

58.     During this time, Defendant John and Dougherty had daily communications about the development of the prototype into Rubicon's "sales ready" product which included plans for marketing, sales and distribution channels.

59.     In or about June 2014, Defendant John blindsided Dougherty by informing him that he "hired" Mark Roberts ("Roberts") to prepare the CAD drawings for the Nite Track device.

60.     Upon information and belief, Roberts' CAD work for Rubicon turned out to be limited to approximately 150 hours.

61.     With regards to Roberts' "piece" of Rubicon, Defendant John intentionally failed to disclose beforehand that, by giving 7.5% of Rubicon to Roberts, he was, at the same time, purportedly diluting Dougherty's 40% ownership interest in Rubicon.

62.     In or about February 2015, Defendant John approached Dougherty for more money for purported "operating capital."

63.     At this time, Defendant John represented to Dougherty that he could not be approved for any type of loan based upon his credit.

64.     Defendant John also falsely claimed that once the "sales ready" Nite Track device could be offered to the public, it would take off and he intended to repay Dougherty for this $10,000.00 capital infusion, as well as, for his previous financial contributions.

65.     Based upon these representations, in March 2015, Dougherty applied for and received a $10,000.00 loan with the Miami-Dade Federal Credit Union ("MDFCU") for which he would be personally responsible.

66.     Upon receipt of the funds, at Defendant John's direction made over interstate wires, Dougherty deposited $10,000.00 into Rubicon's account for which he has never been repaid as a result of Defendant John's "policy" not to repay Rubicon debts in his sole discretion.

67.     Due to Defendant John's deliberate concealment of his acts and deliberate misrepresentations to Dougherty, Dougherty did not discover nor could he have fully ascertained that Defendant John had defrauded him relative to all of these initial investments and those made in 2015 through 2021 until early 2022.

## RUBICON'S ACCOUNTING, BUSINESS ADVISORS AND BOOKKEEPERS' PARTICIPATION IN SCHEMES TO DEFRAUD DOUGHERTY

68.     Upon information and belief based upon representations made by Defendant John to Dougherty, subsequent to Rubicon's official corporate registration, Defendants Mueller Prost and Richars were retained by Defendant John to provide  accounting, bookkeeping and business consulting services to Rubicon.

69.     Upon information and belief based upon representations made by Defendant John to Dougherty, beginning in late-2014, Defendant John, with the assistance of his professional

accountants, business advisors, consultants and bookkeeping team, Defendants Mueller Prost and Richars, began to engage in a series of schemes to procure additional and increasingly substantial capital infusions from Dougherty and others investors.

### *Defendant Mueller Prost*

70.     In 1983, Doug Mueller and Michael Prost founded Defendant Mueller Prost, an accounting and consulting firm purportedly focused on the vision of bringing midsized entrepreneurs and business owners the solutions often reserved for Fortune 500 companies.

71.     At all times material hereto, Defendant Mueller Prost's principal place of business was located at 7733 Forsyth Blvd, Suite 1200, St. Louis, Missouri 63105 ("Mueller Prost Headquarters").

72.     By November 1, 2016, Defendant Mueller Prost had grown to four offices and had 17 partners "specializing in taxes, estate planning, business consulting and 'good, old-fashioned accounting services."

73.     Subsequently, Defendant Mueller Prost became one of the fastest growing accounting and business advising firms in the country in large part by marketing themselves as "trusted advisors to our clients" with a corresponding commitment to their employees' healthy work-life balance.

74.     Moreover, Defendant Mueller Prost built a public image of honor and integrity citing its extensive philanthropic activities in which they involve their employees and clients.

75.     Defendant Mueller Prost's online image is supported, in part, by "paid-for" online advertising articles which claimed to be honest and good stewards of their clients' affairs.

76.     Upon information and belief, initially by representations made to Dougherty by Defendant John and later evidenced by work product, Defendants Mueller Prost provided services to Rubicon from 2015 through June 2021, which included the preparation of: (1) Rubicon's Tax Returns; (2) K-1 Statements; (3) Rubicon business valuations presented to members and investors; (4) legal documents; (5) CAP Tables; and (6) bookkeeping reconciliations.

77.     Upon information and belief, from 2015 through June 1, 2021, Defendants Mueller Prost and Richars provided business consulting advice to Defendant John and Rubicon.

### *Defendant Richars*

78.     On November 3, 2011, Defendant Richars became a licensed Certified Public Accountant in the State of Missouri, License Number 2011037038.  At all times material hereto, Defendant Richars, as a licensed CPA, was required to operate under the Code of the American Institute of Certified Public Accountants ("CPA Code" and "AICPA" respectively).

79.     By 2014, Defendant Richars was an associate CPA with Defendant Mueller Prost.

80.     On July 19, 2017, Defendant Mueller Prost announced the promotion of "**Terry Richars, CPA/ABV, ASA director of Accounting Services to partner**" in the online publication www.CPAPracticeAdvisor.com, a position he held, upon information and belief, until 2021.

81.     In 2016 or 2017, Defendant Richars applied for and received an Accredited Business Valuation Certification ("ABV") from the American Institute of Certified Public Accountants ("AICPA").

82.     At all times relevant hereto, Defendant Richars, as a CPA and business valuator, used his ABV certificate to provide legitimacy to Rubicon's valuation and financial status.

83.     As per the ABV certification, Defendant Richars was required to display his knowledge of discounted cash flow and asset accumulation methods to estimate the fairest market value relative to Rubicon valuations.

84.     At all times material hereto, Defendant Richars also claimed to have the Accredited Senior Appraiser ("ASA") credential.

85.     From 2015 through June 2021, Defendant Richars provided accounting, tax consulting/preparation, business advising, business valuation, bookkeeping services, as well as

prepared legal documents such as promissory notes for Defendant John and/or Rubicon while working as a partner of Mueller Prost.

86.     From 2015 through June 2021, Defendant Mueller Prost, had the authority and/or capacity and/or duty to direct, control, supervise, monitor and/or manage Defendant Richars with regard to his and his team's services provided to Rubicon and Defendant John.

87.     After June 2021, Defendant Richars founded the accounting firm Defendant Grant Cole who provided accounting, tax consulting/preparation, business advising, business valuation and bookkeeping services for Rubicon.

88.     As the founder and principal of Grant Cole, and in his individual capacity, Defendant Richars had the authority and/or capacity to direct/control employees and non-employees who worked on the Rubicon business account.

89.     Defendant Richars has and continues to tout himself as a specialist in startup business ventures with national scaling potential.[2]

90.     Upon information and belief, from 2015 through 2021, Defendant Richars managed/supervised the services Mueller Prost performed for Rubicon.

91.     Upon information and belief, from 2014 through 2022, Defendants Mueller Prost, Richars and John, prepared excel spreadsheets related to: (1) Rubicon's membership interests over time ("Rubicon's CAP Tables"); (2) Rubicon product sales; (3) payment of commissions; and (4) distributions of cash pursuant to Foster's "buy-in" to Rubicon (collectively "Rubicon Spreadsheets").

92.     From 2019 through 2021, Defendants Mueller Prost, Richars, and John manipulated Rubicon's books of account for these Defendants' financial benefit.  Ultimately, as a reward for his

---

[2]For example, Defendant Richars claims to have supported the raising of millions of dollars from various investors for Pet Nutrition Kitchens, LLC which was founded in December 2020.   Defendant Richars also claims to be the Chief Executive Officer of Kitchen Table's Snack Strips.

participation in the schemes to defraud Dougherty and others, Defendant Richars would be promised 10% equity position in Rubicon or another business entity created by Defendant John in or around 2021.

93.     Notably, this new business or the continuation of Rubicon with Richars holding a 10% equity position would be presented to third parties without initially mentioning Dougherty's position with Rubicion.

## 2015 - 2021 – DEFENDANTS JOHN, MUELLER PROST, AND RICHARS'S COLLABORATIVE FRAUDULENT SCHEMES TO DEFRAUD DOUGHERTY MILLIONS OF DOLLARS

### (1)     THE FIRST FRAUDULENT RUBICON VALUATION SCHEME

94.     In May 2015, upon information and belief, Defendant John, with the assistance of Defendants Mueller Prost and Richars, kicked off a campaign to raise capital, selling Rubicon membership interest.

95.     Upon information and belief, Defendant John consulted with Defendants Mueller Prost and Richars as to obtaining Rubicon's valuation for purposes of pricing Rubicon's membership interest.

96.     At that time, in or about May 2015, after working with his co-conspirators, Defendant John claimed over interstate wires that Rubicon's valuation was $500,000.00.

97.     In May 2015, Defendants Mueller Prost and Richars knew or should have known given their unique relationship to Rubicon, that Rubicon had zero sales of its Nite Track Device; Rubicon was "in the red" on a monthly basis without any revenue; Defendant John was still in the process of finishing the "sales ready" product; and that, but for Dougherty's financial contributions, Rubicon would have financially collapsed.

98.     In May 2015, Defendant John, upon information and belief, transmitted Rubicon's fraudulent $500,000.00 valuation and sold 1% of Rubicon interest to Mark Sprinkle for $5,000.00.

99.     In or about May 2015, Defendant John offered to Dougherty's girlfriend, Lourdes Araujo ("Araujo"), over interstate wires, for her to purchase 5% of Rubicon for $25,000.00 based upon the fraudulent valuation that he, upon information and belief, conjured up with his accountant/business advisor co-conspirator Defendants Mueller Prost and Richars.

100.    In or about May 2015 and thereafter, Defendant John fraudulently concealed to Dougherty and Araujo that he intended to continue to sell membership interests for cash without notice which would dilute their interests.

101.    On June 7, 2015, based upon Defendant John's false representations, upon information and belief, made with the knowledge and assistance of his accountant/business advisor co-conspirators Defendants Mueller Prost and Richars, Araujo invested $25,000.00 into Rubicon for a purported 5% membership interest in Rubicon.

102.    In or about September 2015, Defendant John offered William Pulliam ("Pulliam") the opportunity to purchase 5% of Rubicon's membership's interest for $25,000.00 again using the fraudulent valuation he, upon information and belief, conjured up with his accountant/business advisor co-conspirator Defendants Mueller Prost and Richars.

103.    In September 2015, Pulliam paid Defendant John $25,000.00 which was used, directly or indirectly, for his financial benefit, and that of his co-conspirators Defendants Mueller Prost and Richars.

104.    In December 2015, Defendant John offered and sold William another 1% of Rubicon's membership interest for $5,000.00 based upon the fraudulent valuation.

105.    In or about February 2016, Araujo was offered to purchase 15.145% of Rubicon for $75,000.00 by Defendant John using the fraudulent valuation.

106.    With respect to this transaction, Defendant John: (1) failed to inform Dougherty or Araujo that he added at least three new Rubicon members which had diluted Dougherty and Araujo's

respective interest in Rubicon; (2) that he would continue to sell or simply give away Rubicon membership interest which would dilute Dougherty and Araujo's investments in a Ponzi-like investment scheme; and (3) that he had no intention of disclosing or notifying either Dougherty or Araujo before he sold or gave away additional Rubicon membership interests.

107.    With Araujo's $75,000.00 investment, Defendant John, with the assistance of co-conspirators Defendants Mueller Prost, and Richars fraudulent raised $140,000.00 purportedly selling Rubicon's interest as evidenced by the February 2016 Rubicon CAP Table ("February 2016 CAP Table") which was prepared by these co-conspirators and states as follows:

| Rubicon Products LLC | | Partnership Ledger | | EIN# 46-5445934 | | | | US$500,000 Valuation |
|---|---|---|---|---|---|---|---|---|
| | | | Adjusted Percentage of Ownership | | | | Total % | |
| Partner | % acquired | Jul. 2014 | May-15 | Jun. 2015 | Sep. 2015 | Dec. 2015 | Feb. 2016 | |
| John Totsch | 55% | 50.875% | 50.3663% | 47.8479% | 45.4554% | 44.4977% | 37.399% | Developer |
| Kevin Dougherty | 40% | 37% | 36.63% | 34.799% | 33.0586% | 32.3970% | 27.229% | $50,000.00 |
| Richard Totsch | 4.625% | 4.625% | 4.579% | 4.3498% | 4.1320% | 4.0493% | 3.403% | |
| Mark Roberts | 7.50% | 7.50% | 7.425% | 7.0538% | 6.701% | 6.566% | 5.518% | |
| Mark Sprinkle | 1% | | 1% | 0.95% | 0.903% | 0.8850% | 0.744% | $5,000 |
| Lourdes Araujo | 5% | | | 5.00% | 4.75% | 4.655% | 4.655% | $25,000 |
| Barbara Reidner | 5% | | | | 5.00% | 4.95% | 4.16% | $25,000 |
| Barbara Reidner | 1% | | | | | 1% | 0.840% | $5,000 |
| Edward Pupillo | 1% | | | | | 1% | 0.840% | $5,000 |
| Lourdes Araujo | 15.35% | | | | | | 15.345% | $75,000 |
| | | 100.000% | 100.0000% | 100.0000% | 100.0000% | 100.0000% | 100.133% | |

108.    Notably, pursuant to the February 2016 CAP Table, Dougherty's purported equity interest in Rubicon had been diluted to 27.229%.   This CAP Table was not discovered by Dougherty as a direct result of the conduct of Defendant John and Richars until approximately late 2021.

109.    The February 2016 CAP Table shows Defendant John had fraudulently procured $140,000.00 by "selling" membership interest while secretly diluting even the newer member's interest by even "newer" investments—the classic Ponzi scheme.

110.    After selling 28% of Rubicon's interest at the fraudulent $500,000.00 valuation, Defendant John *continued* to give away and/or sell Rubicon's interest through August 2017.

111.     In an updated spreadsheet, created in late 2018 or early 2019, Defendant John reported back to Defendants Mueller Prost and Richars as to what he had done with Rubicon's interest in conjunction with ongoing work to support him in fraudulently selling additional Rubicon interest.

112.     In this particular spreadsheet, Defendant John informs Defendants Mueller Prost and Richars:

Terry,
The Table to the left reflects to the best of my ability, the
current equity distribution of Rubicon. In Marcf 2017, I gave
Jenny one percentage out of my holdings. This is reflected in
the table in that only my percentage was reduced. The same with
the very last entry to Bill of 0.88%. That came out of mine also.
The 4.45% Bill received was to cover his incurred expenses on our behalf.
That *was diluted through* everyone.

As for actual cash purchases, these are Lourdes, Mark Sprinkle, Ed Pupillo,
and Barb Reidner at $5K per point. Aside from the 0.88% I gace Bill, his 4.55% was compensated at $5K per point also.

Kevin and I were founders. Rich Totsch and Mark Roberts were given percentages
for contributions of time, professional services and/or other resources.

| | | |
|---|---|---|
| John gives Neil 7.5% | | |
| John now at 26.32 | | |
| John dilutes 4% to | 25.27% | |
| Kevin dilutes 4% to | 24.48 | |

113.     Defendant John initially concealed this updated spreadsheet from Dougherty, and worked with Defendant Richars and Defendant Mueller Prost to conceal this information from Dougherty until Dougherty discovered same in approximately late 2021.

114.     In this updated spreadsheet, Defendant John put Defendants Mueller Prost and Richars on actual notice as to the amount he raised pursuant to the fraudulent 2015 Rubicon Valuation.  Upon information and belief, their collective efforts procured $140,000.00 which directly or indirectly financially benefitted Defendants John, Mueller Prost and Richars.

*(2)*     ***THE REVOLVING LINE OF CREDIT SCHEME:***

115.     In or about July or early August 2016, Defendant John made representations to Dougherty over interstate telephone wire that Rubicon would need more money to pay operating expenses in order to survive.

116.    Ultimately, Defendant John asked Dougherty to take out a personal line of credit in Dougherty's name alone.

117.    The scheme of having Dougherty take out a personal line of credit was such that Rubicon was not liable for any of the debt, the debt could be easily concealed from future investors or members of Rubicon, and Rubicon's valuation would be unaffected by the outstanding debt.

118.    Defendant John, once again, promised that Dougherty would be paid back by Rubicon paying down on the line of credit.   Dougherty discovered this representation to be false in approximately late 2021 when it was disclosed to him that Defendant John was attempting to start another business venture with Rubicon assets and that Defendant Richars would hold a 10% equity position in the same.

119.    On August 18, 2016, based upon these false representations made by Defendant John with respect to repayment made over interstate wires, Dougherty obtained a personal revolving line of credit in the amount of $25,000.00 from Wells Fargo Bank which was drawn down upon with those funds thereafter deposited into Rubicon account.

120.    Defendant John made periodic requests to draw on Dougherty's personal line of credit over interstate telephone wires while fraudulently asserting that the money would be used for Rubicon's operational expenses when, in reality, most—if not all—funds directly or indirectly benefitted only Defendant John, Mueller Prost, and Richars, and not Rubicon.

121.    At all times relative to Mueller Prost and Richars providing services to Rubicon, they were aware of this line of credit yet failed to take the same into account with respect to Rubicon's valuation and/or financial status as shared with third parties such as to provide material assistance to Defendant John in accomplishing his schemes to defraud Dougherty and other Rubicon investors.

122.     Upon information and belief, the "drawdowns" on Dougherty personal line of credit directly and/or indirectly financially benefited Defendants John, R. Totsch, Mueller Prost and Richars.

*(3)* _**THE FRAUDULENT 2016 PROFIT AND LOSS STATEMENT SCHEME**_

123.     In late November or early December 2016, Defendant John and Dougherty had yet another conversation about Rubicon's alleged need for more operating capital.  Defendant John stated at that time that he had run the numbers and determined the amount of money Rubicon spent in a month on its operations during 2016 which he referred to as Rubicon's "burn rate."

124.     Defendant John also claimed to have put together projections of Rubicon profits based upon Nite Track Units sold, as well Rubicon's current capacity to manufacture units and the cost for additional staff to construct same.

125.     In fact, while Defendant John had asked Dougherty countless times for more money, on this occasion he would ask for $200,000.00.

126.     Prior to asking Dougherty for the $200,000.00, upon information and belief, Defendant John conspired with Defendants Mueller Prost and Richars regarding the amount of money he should ask from Dougherty, as well as, how to structure the loan in such a way to limit Rubicon's exposure.

127.     Additionally, prior to speaking with Dougherty at length about loaning Rubicon $200,000.00, Defendant John, and upon information and belief, Defendants Mueller Prost, and Richars, reviewed Rubicon's books of account, ledgers and discussed projections and prepared that certain Spreadsheet with attached pages entitled "Year 1 Profit/Loss" ("2016 P&L").

128.     The 2016 P&L provided, in detail, Rubicon's 2016 alleged expenses, the amount of Nite Track Units that could be produced, current "distribution channels, marketing suggestions and other projected metrics.

129.     On December 5, 2016, Defendant John and Dougherty conversed over interstate telephone wires regarding the 2016 P&L.

130.    The 2016 P&L contained numerous affirmative fraudulent misrepresentations and fraud by omissions, designed to induce Dougherty to loan Rubicon another $200,000.00 which were not discovered by Dougherty until approximately early 2022.

131.    The 2016 Expense Spreadsheet reveals numerous fraudulent representations as to the amount of "Fixed Costs" and "Variable Costs."

132.    Specifically, Defendant John used the Rubicon bank card for personal expenses which far exceeded what was listed for his "salary."

133.    Additionally, the 2016 Expense Spreadsheet was intended to provide Dougherty with Rubicon's monthly "Burn Rate" of monies spent or owed.  However, Defendant John, and his co-conspirators Mueller Prost and Richars, failed to provide for any debt repayment for amounts due and owing, for example, for the amounts Rubicon drew down on Dougherty's personal line of credit.

134.    In fact, there is no reflection whatsoever of any debts owed to Dougherty even though by that time in 2016, Dougherty had substantially financially contributed to Rubicon since late 2013.

135.    Page Two of the 2016 P&L essentially averages the total monthly amounts for Payroll, Fixed Costs and Variable Costs and provides a monthly Burn Rate compared to projected profits for Nite Track Marine Unit sales ("2016 Burn Rate/Profit Comparison").

136.    The 2016 Burn Rate/Profit Comparison contains substantially fraudulent statements relative to Rubicon's projected Gross Profit for Distributor Sales and the Gross Profit Margin for web based/online sales. Specifically, the 2016 Burn Rate/Profit Comparison states in relevant part:

All sales based on Nite Track Marine (NTM)

| Distributor sales COGS (NTM) | Sale Price to Rubicon | Comission Per unit | Adjusted Receivable | GP | GPM |
|---|---|---|---|---|---|
| $892.00 | $2,000 | $125 | $1,875 | $983 | 52.50% |
| **Web Sales** | | | | | |
| $892.00 | $3,200 | | | $2,308 | 69% |

| Averaged Monthly Burn Rate: | $20,791 | |
|---|---|---|
| Break even monthly sales required: | 21 NTM's | Distributed sales of NTM |
| | 9.5 NTM's | Web sales |

Medical insurance not included in the above costs

| Minimum monthly manuf. capacity with 3 full time production staff: (Based on 251 workdays per year) | 105 units |
|---|---|
| Maximum surge with Jennifer added in: | 146 units |

| Projected gross revenue from 25% (26 units sold) of minimum capacity | $25,558 | (312 units annually) | $306,696 |
|---|---|---|---|
| Less averaged monthly burn rate | $20,791 | | $249,489 |
| | $4,767 | Pre-tax net | $57,207 |
| Projected gross revenue from 50% (52 units sold) of minimum capacity sales: | $51,116 | (624 units annually) | $613,392 |
| ($983 per unit sold) Less averaged monthly burn rate | $20,791 | | $249,489 |
| | $30,325 | Pre-tax net | $363,903 |
| Projected gross revenue from 75% (79 units sold) of minimum capacity sales | $77,657 | (948 units annually) | $931,884 |
| Less averaged monthly burn rate | $20,791 | | $249,489 |
| | $56,866 | Pre-tax net | $682,395 |
| Projected gross revenue from full minimum capacity (105 units): | $103,215 | (1260 units annually) | $1,238,580 |
| Less averaged monthly burn rate | $20,791 | | $249,489 |
| | $82,424 | Pre-tax net | $989,091 |

137.     In the 2016 Burn Rate/Profit Comparison, it fraudulently stated that Rubicon's Gross Profit on the sale of one Nite Track Marine through a distributor would be 52.50%.

138.     In the 2016 Burn Rate/Profit Comparison, it also fraudulently stated that Rubicon's Gross Profit on the sale of one Nite Track Marine through a website/online sale would be an incredible 69%.

139.     Both fraudulent estimates provided to Dougherty and made over interstate wires through email and telephone conversations were done so with the intended purpose to defraud Dougherty into loaning Rubicon another $200,000.00.

140.     Additionally, the projected Rubicon profits failed to disclose that Defendant John would demand "royalties" for each Nite Track sale which would eat into any profits.

141.     Further, nowhere in the 2016 P&L, especially related to projected profits for Nite Track Units sold, does Defendant John disclose that he would take money out of Nite Track sales to fund the research and development for not just Rubicon, but other companies and projects he was working on without Dougherty's knowledge – which would increase "costs" and decrease profits.

142.     Defendants Mueller Prost and Richars which were listed as "variable."

143.    From January 2016, through November 2016, Defendants Mueller Prost and Terry appeared to be receiving approximately $150.00 per month.

144.    In December 2016, that amount increased to $2,000.00 – which was at the same time Defendant John transmitted the 2016 P&L to Dougherty.

145.    Finally, the 2016 Burn Rate/Profit Comparison fraudulently failed to provide how Defendant John intended to pay commissions to himself and other salesman of Rubicon which would not have left ANY profits for Rubicon the Company by design to defraud Dougherty.

146.    When the subject of Defendants Mueller Prost and Richars came up as a "variable cost" during a telephonic conversation on or about December 5, 2016, Defendant John stated that Rubicon was and had been working with Defendants Mueller Prost and Richars relative to accounting and business advisory services and that they would be assisting Rubicon to get to the next level.

147.    Upon information and belief, Defendants Mueller Prost and Richars prepared and/or provided Defendant John material assistance in preparing the 2016 P&L.

148.    Upon information and belief, Defendants Mueller Prost and Richars knew or should have known, as Rubicon's licensed accountants and business advisors, that the actual/estimated expenses and profits were fraudulent.

149.    Prior to and during the December 5, 2016, telephone conversation, Defendant John stated to Dougherty that he needed him to provide an additional substantial loan to Rubicon in the amount of $200,000.00.

150.    Upon information and belief, Defendants Mueller Prost and Richars knew that Defendant John was transmitting the 2016 P&L over interstate wires and that he was going to use the 2016 P&L to fraudulently procure a loan from Dougherty.

151.    Based upon Defendant John's false representations (which were made with the knowledge and/or imputed knowledge of Defendants Mueller Prost and Richars) made in the 2016

P&L and those made during the December 5, 2016, telephone conversation, Dougherty agreed to loan Rubicon an additional $200,000.00.

152.    However, due to the nature in which this fraudulent activity was intentionally concealed from Dougherty, he did not discover same until approximately early 2022.  Further, Dougherty did not know or have reason to know the extent of this fraudulent activity until early 2022.

*(4)*      ***THE FRAUDULENT 2016 PROMISSORY NOTE SCHEME: Defendants John, Richars and Mueller Prost design a Promissory Note to defraud Dougherty.***

153.    During their December 5, 2016, telephone communication, Defendant John and Dougherty also discussed the terms of the loan for $200,000.00, which included a purported security interest in 40% of Rubicon membership interest and an additional 3% quasi-thank you gift to Dougherty for liquidating a substantial part of his retirement savings to loan Rubicon the money.

154.    Upon information and belief, Defendants John and Richars, as an associate of Defendant Mueller Prost, discussed how to structure the terms of Dougherty's loan to Rubicon prior to the December 5, 2016, telephone call.

155.    On December 7, 2016, two days after their December 5, 2016, telephone call, Defendant John, with the imputed knowledge of Vice President Defendant R. Totsch, sent an email over interstate wire to Defendants Mueller Prost and Richars with a Subject line "Terms and conditions for $200K note."

156.    Specifically, the December 7, 2016, email provided in relevant part:

> **Kevin Dougherty and Lourdes Araujo are going to loan Rubicon products LLC $200,000.00 for use as working capital**.  We have negotiated the following terms and conditions.
>
> The $200,000.00 will be released in quarterly tranches of $50,000.00 each or should cash flow allow, each tranche will be released as needed. Basically, if Rubicon doesn't need to draw down a tranche after three months, we can put it off until we do need it.
>
> The note will be based on a four-year payback, interest only for the first year.  Interest will be accrued at ten percent annually.

There will be no prepayment penalties.

**The note will be secured with ownership rights equal to forty percent of the company**.   This will be proportionally decreased on a one-to-one basis as the note is paid down.

**An initial stock incentive will (sic) given to Dougherty of two percent and a one percent to Araujo**.  If it's possible, I'd like [Mueller Prost] to formerly draft this up for presentation to Kevin and Lourdes.  If that's doable, how long do you think it will take?

**We're glad you and [Mueller Prost] are on our team**!

A copy of the December 7, 2016, email is appended hereto marked **Exhibit "A."**

157.    At the time Defendant John caused to be transmitted his December 7, 2016, email to Defendants Richars and Mueller Prost, Defendants John, and upon information and belief, Defendants Mueller Prost and Richars, knew that Dougherty's had been defrauded into agreeing to loan Rubicon $200,000.00 based upon the fraudulent 2016 P&L Statement.

158.    Within days, Defendants Mueller Prost and Richars prepared the promissory note and transmitted same over interstate wires knowing that that Dougherty had agreed to provide Rubicon with a $200,000.00 loan based upon fraudulent information they assisted in delivering to Dougherty and that Dougherty would be unable to discover the fraud relative to same.  In fact, the metadata on the original document indicates that it was authored by Defendant Richars.

159.    Defendants Mueller Prost, Richars and John fraudulently designed the promissory note to make it appear that Dougherty was receiving, as collateral, 40% of Rubicon's membership interest.

160.    However, as Rubicon's accountants and highly experienced business consultants, Defendants Mueller Prost knew, or should have known, that Rubicon itself could not pledge membership/equity interest.

161.    Indeed, Rubicon's CAP Table as of February 2016, which was prepared by Defendant John with the knowledge, assistance and/or consent of Richars, demonstrates that Defendants Mueller

Prost and Richars knew Rubicon did not own any of its interests at the time it prepared the fraudulent promissory note at Defendant John's direction.  Specifically, Rubicon's February 2016 CAP table provides as follows:

| Partner | % acquired | | Jul. 2014 | May-15 | Jun. 2015 | Sep. 2015 | Dec. 2015 | Feb. 2016 | |
|---|---|---|---|---|---|---|---|---|---|
| | Rubicon Products LLC | Partnership Ledger | | | EIN# 46-5445934 | | | US$500,000 Valuation | |
| | | | | Adjusted Percentage of Ownership | | | | Total % | |
| John Totsch | 55% | | 50.875% | 50.3663% | 47.8479% | 45.4554% | 44.4977% | 37.399% | Developer |
| Kevin Dougherty | 40% | | 37% | 36.63% | 34.799% | 33.0586% | 32.3970% | 27.229% | $50,000.00 |
| | | | | | | | | | |
| Richard Totsch | 5% | | 4.625% | 4.579% | 4.3498% | 4.1320% | 4.0493% | 3.403% | |
| Mark Roberts | 7.50% | | 7.50% | 7.425% | 7.0538% | 6.701% | 6.566% | 5.518% | |
| Mark Sprinkle | 1% | | | 1% | 0.95% | 0.903% | 0.8850% | 0.744% | $5,000 |
| Lourdes Araujo | 5% | | | | 5.00% | 4.75% | 4.655% | 4.655% | $25,000 |
| Barbara Reidner | 5% | | | | | 5.00% | 4.95% | 4.16% | $25,000 |
| Barbara Reidner | 1% | | | | | | 1% | 0.840% | $5,000 |
| Edward Pupillo | 1% | | | | | | 1% | 0.840% | $5,000 |
| Lourdes Araujo | 15.35% | | | | | | | 15.345% | $75,000 |
| | | | 100.000% | 100.0000% | 100.0000% | 100.0000% | 100.0000% | 100.133% | |

162.     In short, promissory note was intended to defraud Dougherty out of $200,000.00 plus interest while also attempting to make it seem as if Rubicon was pledging a security interest, however, since Defendant John was the only other Rubicon member whom purportedly owned over 40% of Rubicon at that time, and Rubicon owned none of its own equity, it was and is Defendant John's equity which was pledged to Dougherty by the promissory note.

163.     On or about December 14, 2016, Dougherty executed that certain Promissory Note[3] ("December 14 Promissory Note") based upon Defendant John's representations and the belief that Defendants Richars and Mueller Prost were both working in his best interest.

164.     At no point did Defendants Mueller Prost or Richars notify Dougherty of any potential conflict of interest relative to preparing the promissory note between Rubicon and Dougherty.

---

[3] On or about January 5, 2017, Defendant John executed the Promissory Note.

165.    At no point did Defendants Mueller Prost or Richars disclose to Dougherty that they were not attorneys, or that he had the right to seek independent counsel prior to executing the December 14 Promissory Note.

166.    The December 14 Promissory Note states in relevant part:

Grant of Security Interest

As a condition for Secured Party to agree to lend Debtor the funds contemplated herein, Debtor grant (sic) to Secured Party, a security interest in the equity of Rubicon Products, LLC (the "Collateral"). The Collateral will be 10% Equity interest for each $50,000.00 borrowed: **hence a maximum of 40% equity interest for the $200,000.00 loan**. As principal is paid back on the loan, the Collateral will be reduced 1% for each $5,000.00 of principal repaid.

This security interest is granted to secure the debt evidenced by this note and agreement and all costs and expenses incurred by Secured Party in the collection of the debt.  [Emphasis added].

A copy of the Promissory Note is appended hereto marked **Exhibit "B."**

167.    After the execution of the December 14 Promissory Note, Dougherty fulfilled his promise to loan Rubicon $200,000.00, (in $50,000.00.00 installments) which came from Dougherty cashing out his 401k retirement savings.

168.    Each of the $50,000.00 investment installments were made pursuant to the dates and terms of the December 14 Promissory Note.

169.    Most, if not all the $50,000.00 installments were used to directly and/or indirectly financially benefit Defendants John, Mueller Prost, and Richars.   To date, Dougherty remains unpaid for amounts due and owning under the December 2016 Promissory Note which, with interest, exceeds $350,000.00.

*(5)*     *THE SCHEME TO MANIPULATE RUBICON'S BOOKS RELATED TO MONIES OWED TO AND CONTRIBUTED BY DOUGHERTY FROM 2014 THROUGH 2021*

170.    From 2015 through 2021, Defendants Mueller Prost, and Richars worked in concert to avoid placing Dougherty's reimbursable loans and contributions on Rubicon's financial books for

purposes of creating fraudulent and mis-leading valuations, as well as, to make it difficult or impossible for Dougherty to ever be repaid.

171.    From 2015 through 2021, Defendants Mueller Prost, Richars and John worked in concert to procure additional capital contributions from Dougherty into Rubicon for their financial benefit.  Dougherty discovered these concerted efforts in early 2022.

172.    In November 2017, approximately 2 months after making what was supposed to be the last $50,000.00 installment under the December 14 Promissory Note, Defendant John once again approached Dougherty and asked Dougherty for yet another $50,000.00 contribution because he claimed that the redesign of the Nite Track cost more than he had anticipated, that the "numbers" were so low that he needed this additional capital just to keep Rubicon in business.

173.    These fraudulent representations were made over interstate telephone wires with the intent to procure this additional $50,000.00.

174.    On November 21, 2017, Dougherty, in reliance upon Defendant John's fraudulent misrepresentations, once again complied with Defendant John's instructions and wired Rubicon an additional $50,000.00.

175.    Dougherty's payment into Rubicon was not listed as a loan from Dougherty.

***June 2018 - $10,000 More!***

176.    Further, on or about June 9, 2018, Dougherty complied with *yet another* of Defendant John's requests for additional capital and deposited $10,000.00 of his personal money into Rubicon's account.  A copy of Dougherty's June 2018 Bank Statement is appended hereto marked **Exhibit "C."**

177.    Defendant John's representations were false and fraudulent as he knowingly would use Dougherty's additional contributions for personal use or to inappropriately funnel funds for non-Rubicon related "Research and Development."

***July 2018 - $10,000 More!***

178.     In early July 2018, the same scenario occurred: Defendant John contacted Dougherty over interstate wires and advised that he needed another $10,000.00 for Rubicon's "operational expenses".

179.     In reliance on Defendant John's statement, Dougherty deposited $10,000.00 into Rubicon's account.  A copy of Dougherty's July 2018 Bank Account is appended hereto marked **Exhibit "D."**

180.     Defendant John routinely funneled money out of Rubicon directly and indirectly, with the knowledge, advice and/or counsel of Defendants Mueller Prost and Richars.

181.     These substantial amounts were intentionally and largely unaccounted for on Rubicon's books of account, spreadsheets, business valuations, tax returns and K-1s which were prepared at the Direction of Defendant John, with the advice, counsel and/or knowledge of Defendants Mueller Prost and Richars.

182.     In sum, Dougherty contributed to Defendant John and Rubicon: (1) $20,000.00 between late 2013 and 2014 for Defendant John's move from Vermont to Missouri and the development of the Original Rubicon Prototype; (2) $40,000.00 to become a "formal" partner in Rubicon in or about April 2014; (3) $10,000.00 in 2015 personal loan Dougherty obtained from his credit union; (4) tens of thousands from the personal revolving line of credit of which was drawn upon, then paid by Dougherty, only to be drawn down again and again;   (5) $200,000.00 in conjunction with the December 2016 Promissory Note (which was loan in $50,000.00 installments through September 2017) for which Rubicon owes nearly $350,000.00; (6) $50,000.00 in November 2017; (7) $10,000.00 in June of 2018; (8) $10,000.00 in July 2018; and (9) approximately $150,000.00 for Rubicon's Grass-Roots Marketing Campaign, Rubicon's General Marketing Campaign and Rubicon's Miscellaneous Costs.

183.     From 2016 through 2021, Defendants Mueller Prost and Richars, with and/or at the direct and/or indirect consent of Defendant John, prepared and transmitted over interstate wires Profit and Loss Statements, Business Valuations, Tax Returns, K-1 statements and other documents related to Rubicon's financials (alleged further *infra)* that specifically did not take into account monies owed to Dougherty.

184.     Defendant Mueller Prost and Richars knew or should have known that the documents they prepared would be relied upon by Dougherty, other members of Rubicon and potential investors to determine the accuracy of Rubicon's financial status, books of account and the amount of debt Rubicon carried and that the reliance upon these documents would cause substantial damages to Dougherty and others.

185.     Dougherty did not discover Defendant Mueller Prost and Richars conduct relative to this scheme until early 2022.

***(6)     THE SECOND FRAUDULENT VALUATION SCHEME: In mid to late January 2019, Defendant John directed Defendants Mueller Prost and Richars to provide a written valuation of Rubicon's worth.***

186.     At that time, Defendants Mueller Prost and Richars had extensive knowledge as to Rubicon's financials, as well as debts owed to Dougherty by Rubicon that would substantially affect Rubicon's valuation.

187.     At that time, Defendant John was negotiating cash out a large percentage of his interest, and that of his brother, Defendant R. Totsch in liquidity event (an independent scheme which will be alleged in detail, infra).

188.     For purposes of this liquidity event, Defendant John directed his co-conspirators, Defendants Mueller Prost and Richars, to prepare a Rubicon valuation for purposes of defrauding Dougherty and others.

189.    At that time, Defendants Mueller Prost, and Richars had extensive knowledge as to Rubicon's financials, as well as debts owed to Dougherty by Rubicon that would substantially affect Rubicon's valuation considering that at least one of the loans provided by Dougherty to Rubicon allegedly placed a security interest on 40% of Rubicon's interest.

190.    In fact, as alleged in detail, *infra,* Defendants Mueller Prost and Richars had actually prepared and designed the promissory note for said loan.

191.    On January 31, 2019, Defendants Mueller Prost and Richars, at the request of Defendant John, caused to be sent over interstate wires a second fraudulent written Rubicon valuation stating that Rubicon was worth $1,500,000.00 as of that date ("January 31, 2019, Rubicon Valuation").   Dougherty could not and did not discover the fraud associated with the January 31, 2019, Rubicon Valuation until early 2022.

192.    Specifically, the January 31, 2019, Rubicon Valuation, which was printed on Defendant Mueller Prost's letterhead and signed by Defendant Richars as CPA/ABV and ASA provided:



**Mueller Prost**
CPAs + Business Advisors

January 31, 2019

Rubicon Products, LLC
Attention: John Totsch
7322 Lakeshore Drive
Cedar Hill, MO 63016

Dear John:

This letter is in regards to the approximate value of Rubicon Products, LLC, the "Company".

Based on the 2019 projection prepared by the Company and utilizing the following variables, the estimated value of the Company is $1,500,000. Variables utilized as follows:

- Production of 40 units per month in 2019
- Fixed overhead of $164,655 in 2019
- Average gross profit per unit of $1,253 in 2019
- Annual profit growth for 2020-2023 of 25%, 20%, 15% and 10%, respectively.
- Utilization of a 30% discount rate.

Please let me know if you have any questions or would like to review in further detail.

Sincerely,

Terry E. Richars, CPA/ABV, ASA

*Advising with Vision®*                                                www.muellerprost.com

Phone 314.862.2070 | Fax 314.862.1549 | www.muellerprost.com
St. Louis | 7733 Forsyth Blvd. | Suite 1200 | St. Louis | MO | 63105
St. Charles | 2460 Executive Drive | St. Charles | MO | 63303
Irvine | 2010 Main Street | Suite 340 | Irvine | CA | 92614



A copy of the January 31, 2019, Valuation Letter is appended hereto marked **Exhibit "E**."

193.    Upon information and belief, Mueller Prost and Richars' January 31, 2019, Rubicon Valuation was transmitted over interstate wires around that time period to third parties with the intent to defraud them into purchasing Rubicon's interest knowing that the same contained false information.

194.    For example, based upon a 2016 Profit and Loss Statement which was prepared by Defendant John with the assistance of Defendants Mueller Prost, and Richars, provided that Rubicon had monthly expenses averaging $20,000.00 per month for 2016.

195.    As such, as of 2016, the total amount of Rubicon's expenses for salaries, fixed and variable costs were over $240,000.00.

196.    In the January 31, 2019 Rubicon Valuation, Rubicon's "fixed overhead" was fraudulently stated by Defendants Mueller Prost and Richars to be $164,655.00 when they knew, or should have known, that Rubicon's fixed overhead had increased as it had added expenses and also owed monthly installments on a 2016 promissory note to Dougherty.

197.    More specifically, in March 2018, Defendant John agreed to Defendant Foster becoming a Rubicon distributor and sales of the Nite Track substantially increased – as did costs associated with manufacturing the devices.

198.    As such, Rubicon's fixed overhead should have been substantially more than $164,655.00.

199.    Moreover, Defendants Mueller Prost and Richars knew that by January 31, 2019, Rubicon also had other debt obligations in the form of loans from a short-term/hard money/high interest lending company, Defendant Short Term Lending, which was formed at Defendant Mueller Prost Headquarters by Defendant Richars, and upon information and belief, Michael Prost using his Mueller Prost email address. [4]

200.    By reducing the "fixed cost" overhead, by failing to include debts scheduled to be paid by Rubicon, Defendants John, Mueller Prost and Richars fraudulently inflated profitability which resulted in a gross misrepresentation of Rubicon's value in the January 31, 2019.

201.    The January 31, 2019, Rubicon Valuation was transmitted by Defendants Mueller Prost, and Richars, knowing that it contained fraudulent information, and that Defendant John was going to use this document to defraud Dougherty and others for these Defendants direct and/or indirect financial benefit.

---

[4] In fact, there were two loans by Defendant Short Term Lending made to Rubicon in 2018 and the same were part of a scheme to defraud Dougherty while providing Defendant Richars an opportunity to obtain an equity position in Rubicon and possibility another business owned by Defendant John.   This scheme is alleged further, *infra.*

202.    Defendants Mueller Prost, Richars, and John conspired to overinflate Rubicon's value as Defendant John was in negotiations with a third party to purchase 20% of Rubicon's interest, mostly belonging to Defendants John and R. Totsch, but this "deal" would have also directly or indirectly financially benefitted Defendants Mueller Prost and Richars.

203.    Moreover, Defendants Mueller Prost and Richars knew that by January 31, 2019, Rubicon also had other debt obligations in the form of loans from a short-term/hard money/high interest lending company, Defendant Short Term Lending.

204.    In fact, there were two loans by Defendant Short Term Lending made to Rubicon in 2018 and the same were part of a scheme to defraud Dougherty while providing Defendant Richars an opportunity to obtain an equity position in Rubicon and possibly another business owned by Defendant John.   This scheme is alleged further, *infra,* in Subsection 7: THE SHORT-TERM LENDING SCHEME.

*(7)*     ***THE SHORT-TERM LENDING SCHEME:***

205.    In 2017, Defendant Mueller Prost provided substantial assistance to Defendant Richars to start a hard-money, high-interest and short-term lending business named Defendant Short Term Lending Solutions, LLC ("Short Term Lending").

206.    Short Term Lending purportedly provided these hard-money, high-interest and short-term loans to Defendants Mueller Prost and Richars' clients.

207.    In the capacities of being Certified Public Accountants and self-proclaimed small-business consultants, these Defendants sat in a position of trust and confidence with their clients as their accountants and bookkeepers.

208.    Additionally, Defendants Richars and Mueller Prost provided these Clients consulting advice aimed at "incubating" a small business to allegedly grow into a sustainable enterprise.

209.     Upon information and belief, Short Term Lending was created to capitalize on this fiduciary position by making hard-money, high-interest and short-term loans to companies and individuals they knew to be in vulnerable financial position.

210.     On March 4, 2017, Short Term Lending's Articles of Incorporation were filed with the Missouri Secretary of State.

211.     From inception on March 4, 2017, **Short Term Lending's principal place of business and its Registered Agent is Defendant Richars located at Mueller Prost Headquarters**.

212.     Additionally, Mueller Prost is listed as the company to which the Article of Incorporation is to be returned and Defendant Richars's email at Mueller Prost, trichars@muellerprost.com is listed as the individual at Mueller Prost to receive the returned document.

213.     As alleged further, *infra,* Defendant Short Term Lending provided hard money loans to Rubicon and Dougherty at the direction of Defendants Terry and John, with the imputed knowledge of Mueller Prost, and Richars, without disclosing clear conflicts of interest as Rubicon's CPAs, bookkeeper and accountants.

214.     In total, Short-Term Lending provided three loans to Rubicon, one in 2018 for $40,000.00, another in 2019 for $12,000.00 and the final loan considered to be in 2021 for another $40,000.00 (collectively "Rubicon's Short-Term Loans").

215.     For each Rubicon's Short Term Lending Loans, Defendants Richars and John designed the loans with the intent to conspire to defraud Dougherty and enrich themselves, as well as, to pay Mueller Prost for Rubicon's services.

216.     Indeed, Short Term Lending's "loans" were conspicuously never regularly paid as agreed nor collected as would be expected by a hard-money lender.

217.    Pursuant to a January 5, 2022, email from Defendants Richars and Grant Cole which attached a Statement from the "2021" Short Term Lending Loan, it evidences that Defendant John never made a payment on the loan since its inception.

218.    As of June 17, 2021, Defendant Richars caused to be sent over interstate wire fraudulent balances as to all three loans which he claimed to be approaching $70,000.00.

> **From:** Terry Richars
> **Sent:** Thursday, June 17, 2021 8:37 AM
> **To:** Tracy Kunz <tracy@gonitetrack.com>
> **Cc:** Shannon Ward <shannon.ward24@outlook.com>
> **Subject:** RE: Short Term Lending Combined Notes
>
> Sorry for the delay. Attached are the updated notes and interest for 2021.
>
> Principal Balances -
>
> New Loan 2021003 (Combined 2018010 and 2019006) - $34,700.26
>
> 2019004 - $34,879.29
>
> Thank you,
>
> Terry

A copy of Defendant Richars' June 17, 2021 email is appended hereto marked **Exhibit "F."**

219.    Notably, because Short Term Lending was not regularly paid, it applied the 18% default interest rate of 18% for each of the three loans.

220.    Upon information and belief, Defendants John and Richars conspired to purposely have Rubicon default on all of the three loans such that Defendants Short Term Lending and Richars could further profit and/or cash in these fraudulent debts for equity in Rubicon or another one of Defendant John's entities.

221.    Notwithstanding that the Short-Term Lending loans were not regularly paid, Rubicon did pay substantial amounts during a time where both Defendants John and Richars knew Rubicon

was in default of the 2016 Promissory Note which was drafted and designed by Defendants Mueller Prost and Richars.

222.    As alleged *supra* and further *infra*, Defendants Mueller Prost and Richars authored and designed that certain 2016 Promissory Note in which Dougherty loaned Rubicon $200,000.00 which deceptively states that the same was secured by 40% of Rubicon's membership interest.

223.    For example, with respect to the first loan in 2018, Rubicon paid Short Term Lending, i.e., Rubicon's accountant's company, $26,681.92 while Dougherty's secured debt was in default.

224.    In reality, Defendants Richars and John, with the imputed knowledge of Mueller Prost, authored and designed each Short-Term Lending Loan such that Dougherty would be a co-maker of each Promissory Note, and not simply a personal guarantor.

225.    Upon information and belief, Defendants Richars and John conjured up these fraudulent "loans" to Rubicon knowing that the lent monies were going to be used by Defendant John to buy real estate/vehicles and other personal items, while also being used to pay for Mueller Prost's accounting services provided to Rubicon.

226.    Moreover, these fraudulent loans were used to defraud Dougherty out of his position and/or equity interest in Rubicon.

227.    More specifically, in late 2021 or early 2022, Defendants John and Richars conspired to convert these unpaid "loans" into 10% of Rubicon equity and/or equity in a new company for himself - which would defraud Dougherty by preventing him from recovering moneys loaned to Rubicon.

*(8)*    ***LOANS TO DEFENDANT JOHN SCHEME: From 2016, when Defendant John withdrew funds out of the Rubicon Bank Account, Defendants Mueller Prost and Richars***

228.    Upon the opening of the Original Rubicon Operating Account and at all times material hereto, Defendant John consistently and constantly withdrew funds from Rubicon's account for his own personal expenses and benefits.

229.     When Defendants Mueller Prost, and Richars complied and prepared Rubicon's books of account, Defendant John's withdrawals were fraudulently defined as loans to Defendant John.   In fact, no loan documents exist and there is no specific ledger that identifies what these "loans" were used for in order to identify their date and terms of repayment.

230.     Upon information and belief, these "loans" were not identified as distributions to Defendant John on his personal tax returns also prepared by Defendants Mueller Prost and Richars, and/or those working at their direction.

231.     Nor were these "loans" identified as distributions to Defendant John when his tax returns were prepared by Defendant Grant Cole.

232.     In fact, these expenditures and withdraws, such as Defendant John signing of a Rubicon Check for $10,000.00 in January 2021 for the purchase of a Ford Truck in his individual name, were not loans at all, but a scheme to fraudulently withdraw funds from Rubicon using interstate wires to transmit the fraudulent accounting of Rubicon's books to third parties to procure investments.

233.     Defendants Mueller Prost, Richars, Grant Cole and others were financially rewarded for their respective role in allowing him to make fraudulent distributions to himself as each received and accepted compensation for their accounting and bookkeeping services which allowed this scheme to endure for over five years.

## THE RICO "ENTERPRISE" ADDS CO-CONSPIRATOR DEFENDANT CURTIS NEAL FOSTER

234.     Defendant Foster, a well-known competitor in the sport fishing tournament circuit with numerous contacts and corporate sponsorships including high-end center console boating manufacturer Contender, Yamaha Outboards, Garmin Marine Electronics and other boat accessories. On or about March 7, 2018, Defendant Foster contacted Dougherty and inquired about obtaining a free Nite Track camera.

235.     During this initial conversation, Dougherty indicated that Rubicon was not able to give out a free Nite Track device as Rubicon was still a start-up business.  However, Dougherty stated that if Defendant Foster could locate some customers to purchase Nite Track devices, he would speak with Defendant John about offering him a unit for free.

236.     Defendant Foster responded by stating that he could refer six customers to Rubicon to purchase a Nite Track camera.

237.     Defendant Foster claimed that whatever he "put on his boat" his friends, fellow sport-fisherman, fans, and other business contacts would follow suit.

238.     Shortly after their initial conversation, Defendant Foster procured 6 purchase orders and was sent a free Nite Track camera.

239.     On March 7, 2018, Defendant Foster, similar to other individuals interested in becoming a dealer of Nite Tracks, executed a Rubicon's Standard Confidentiality Agreement ("Confidentiality Agreement").

240.     Subsequently, in or about late March 2018, Defendant John verbally agreed to allow Defendant Foster to be a dealer of the Nite Track for Rubicon.

241.     Upon information and belief, the verbal dealer agreement provided that Defendant Foster would receive as commission the difference between the sales price of the Nite Track to any particular end user and approximately the cost of manufacturing a Nite Track Unit.

242.     While Defendant John established general price guidelines for the sale of Rubicon products which should have applied across the board, it was not uncommon for Defendant Foster to request a reduction in pricing that was exclusive to him. For his part, Defendant John agreed which directly affected Rubicon's profits.

243.     After becoming a Rubicon dealer in March 2018, Defendant Foster was successful in increasing Nite Track sales.

244.     In or about October 2018, Defendant Foster expressed further interest to Defendant John and Dougherty in becoming an equity member of Rubicon and taking a more active role its management.

245.     As reported by Defendant John to Dougherty, Defendant Foster wanted to buy into Rubicon such that he, Defendant John and Dougherty were equal or nearly equal partners with each owning approximately 20% of the company.

246.     In or about July 2018, Defendant John was fixated on purchasing land for "recreational purposes".

247.     From the moment Defendant Foster expressed his interest in purchasing some of Rubicon's membership interest in late 2018, unequivocally, Defendant John's primary concern was to get a deal done with Defendant Foster such that he could purchase that certain parcel of land in Washington County, Missouri.

248.     In late 2018, Defendant John stated to Dougherty that Defendant Foster's purchase of some of Defendant John's purported Rubicon interest would provide him the money necessary to close on the real estate.  Additionally, any deal to be made with Defendant Foster would also a substantial payout to his brother, Defendant R. Totsch who had contributed nothing to Rubicon since its formation in 2014.

249.     In late 2018, Defendant John entered into private discussions with Defendant Foster relative to him purchasing shares of Rubicon to become a "partner" in the business.   Subsequent to any particular conversation, Defendant John would provide Dougherty with secondhand information.

250.     Regarding the prospect of the sale of 20% of Rubicon's interest, Defendant Foster and Defendant John both had their own agendas and plans and schemes which would use Rubicon to defraud Dougherty out of millions of dollars in damages.

251.    In some of these schemes, both Defendant Foster and Defendant John worked together to defraud Dougherty specifically.

252.    In others, Defendant John would endeavor to defraud Defendant Foster and, in others, Defendant Foster would similarly seek to defraud Defendant John.

253.    In the fraudulent schemes outlined hereinbelow, both Defendant John and Defendant Foster's caused Dougherty substantial Damages.

## DEFENDANT JOHN'S 2019 SCHEME TO FRAUDULENTLY SELL 20% OF RUBICON INTEREST TO DEFENDANT FOSTER

254.    In January 2019, Defendant John, along with his co-conspirators, Defendants Mueller Prost, and Richars, began preparing the financial picture of Rubicon he wanted to present to Defendant Foster for his consideration of purchasing 20% of Rubicon's interest.

### *The Fraudulent August 2019 CAP Table*

255.    Specifically, in early 2019, Defendant John, with the assistance of Defendants Richars, a Mueller Prost partner, Ward, a Mueller Prost employee, modified the 2015 Rubicon CAP Table to allegedly account for Rubicon member interest as of August 2019 ("2019 CAP Table").   Dougherty discovered the fraud relative to the 2019 CAP table in early 2022.

256.    The 2019 CAP Table evidence that Defendants John, Mueller Prost and Richars believed that over 101% of Rubicon's interest was already owned by various Rubicon members.

257.    While it is unclear whether Defendant John sent Defendant Foster the 2019 CAP Table, notably, the same states that Rubicon's valuation remained at $500,000.00 which was, as alleged *supra* fraudulent when provided to potential Rubicon members in 2015 and 2016.

258.    In January 2019, further diminishing Rubicon's purported valuation, was the fact that 36.40% of Rubicon equity members had absolutely nothing further to contribute to Rubicon as they had either paid for or been gifted membership interest.

259.    On January 31, 2019, Defendants Mueller Prost and Richars transmitted over interstate wires, with the signature of Mueller Prost Partner Richars containing "CPA, ABV and ASA" accreditations, the Fraudulent January 31, 2019, Rubicon Valuation of $1,500,000.00 with the knowledge that such valuation was a complete falsehood considering and was going to be used at that time by Defendant John to defraud Dougherty and others without their detection. In fact, Dougherty did not discover the nature and scope of the Fraudulent January 31, 2019, valuation until early 2022.

260.    Notwithstanding, Defendant John transmitted over interstate wires the Fraudulent January 31, 2019, Rubicon Valuation to Defendant Foster claiming that he, his brother, Defendant R. Totsch, Roberts and Rubicon had the right to sell him 20% of their respective ownership interest in Rubicon and that Rubicon itself had 4% of its own interest to sell.

### *The February 9, 2019, Fraudulent Operating Agreement Outline*

261.    Additionally, on or about February 9, 2019, Defendant John, upon information and belief, with the assistance of Defendants Mueller Prost and Richars, and without the input of Dougherty, prepared that certain February 9, 2019 Operating Agreement Outline ("February 2019 OAO")  which was transmitted over interstate wires which fraudulently represented the debts and loans owed to Dougherty by Rubicon/Defendant John, especially with respect to the December 2016 Promissory Note obligation which was purportedly collateralized by 40% of Rubicon's membership interest.

262.    The OAO stated in relevant part:

> Kevin Dougherty      Kevin loaned to Rubicon, from 2016 through 2018, operating capital totaling $320,000.00. This money will be paid back to Kevin as a percentage of profit distribution to members. This is a long-term commitment with re-payment based on Rubicon Performance.
>
> To date, Rubicon's policy on profit disbursements to members has been based on the following: 1, three months operation in reserve, 2, all employee expenses paid up and 3, all debts except Dougherty are paid off. When the company is profitable and meets the above thresholds,

> Dougherty will receive $0.25 of every Dollar allotted for profit disbursement, toward his paydown.
>
> Should future events justify a lumpsum paydown Rubicon may elect to do so.
>
> Wells Fargo LOC Rubicon maintains a revolving line of credit through Wells Fargo of $25,000.00, It is paid down as cash flow allows.

A copy of the OAO is appended hereto marked **Exhibit "G."**

263.    Defendant John, with the material assistance of Defendants Mueller Prost, and Richars, sent Defendant Foster the OAO specifically knowing that the December 14 Promissory Note had no provision that Dougherty's debts would be paid through 25% of Rubicon's profits.

264.    Due to Defendants' wrongful conduct, Dougherty was unable to discovery the scope and nature of the fraud within the OAO until early 2022.

265.    Defendant John's statement in the OAO that Rubicon had a formal "policy" about profit disbursements was false and a means to deny profit distributions to Dougherty and other Rubicon members.

266.    Moreover, the OAO also fraudulently stated that Rubicon would retain legal counsel to present a draft of an operating agreement to the members.

267.    In fact, it was Defendant Foster's attorney, not Rubicon's, who would end up drafting Rubicon's operating agreement, which is a sham designed to create an appearance of legitimacy.

268.    Further, while mentioned in the OAO, no draft of the operating agreement would ever be circulated to all of the members of Rubicon, nor did Defendant John request any waiver of notice or opportunity to review the draft be executed by other members of Rubicon, nor did Foster's attorney obtain any conflict waivers for acting on behalf of Foster and drafting Rubicon's operating agreement.

269.    Following the OAO, during March 2019, Defendant John and Foster continued their negotiations relative to foster purchasing 20% membership interest of Rubicon.

***The Fraudulent Purchase Terms and Agreement***

270.    On or before March 23, 2019, Defendant John, with the assistance of Defendants Mueller Prost, and Richars, prepared and sent over interstate wires a document on Rubicon's letterhead entitled "Purchase Terms and Agreement to acquire twenty percent of Rubicon LLC ownership" ("PTA").

271.    The PTA stated that the "deal" to sell Foster 20% of Rubicon's Interest contained numerous fraudulent representations and omissions:

(1) Rubicon did not own 4% of its own interest to sell;

(2) it omitted any reference to the debt owed to Dougherty which was referenced in the OAO;

(3) Defendant John, and his co-conspirators Mueller Prost and Richars, had no intention to provided monthly, quarterly or any statements to anyone regarding Defendant Foster's purported "paydown" of any amounts owed through accrued commissions;

(4) Defendant John knew there had never been and never would be any "profit distributions" by which Defendant Foster could "repay" the amounts owed for purchasing 20% of Rubicon's interest as his manipulation of Rubicon's books, with the assistance of Mueller Prost and Richars, would not allow Rubicon to reach its profit distribution policy; and

(5) to the extent that Defendant John would take a cut out of Defendant Foster's accrued commissions for sales of Rubicon Products to pay himself and his brother, Defendant R. Totsch, for their purported sale of Rubicon interest would further drain any Rubicon revenues that would otherwise be owed to Dougherty; and

(6) Any payment to Defendant John or his brother, Defendant R. Totsch, for their purported interest in Rubicon would be fraudulent because Dougherty had a lien against such interest pursuant to the December 14 Promissory Note.

**DEFENDANT FOSTER'S SCHEME TO FRAUDULENTLY NOTARIZE PTA**

272.     As a self-proclaimed sophisticated businessman, between his private discussions with Defendant John, his receipt of the 2019 Fraudulent Valuation, the OAO and the "Purchase Terms and Agreement to acquire twenty percent of Rubicon LLC ownership" ("PTA"), Defendant Foster detected foul play and seized upon Defendant John's inexperience, as well as, his clear desperation to cash out his Rubicon's equity.

273.     On or about March 23, 2019, Dougherty and Defendant John had traveled to Defendant Foster's home in Alabama to complete the discussions which culminated in the executed PTA at Foster's home in Alabama.

274.     Defendant Foster allegedly locked in the term sheet, aka the PTA, by having Dougherty and Defendant John execute the same while they were still in Alabama and thereafter had it fraudulently notarized by an Alabama notary on March 26, 2019, when neither Dougherty nor Defendant John were in Alabama.

275.     Thereafter, Defendant Foster caused the fraudulently notarized PTA to be sent over interstate wires to Dougherty and Defendant John.

276.     Additionally, for his part, Defendant Foster executed the PTA and sent the same over interstate wires which fraudulently indicated he would agree to pay $215,000.00 for 20% of Rubicon's membership interest which he knew he would never do and never did.

277.     Further, in the PTA, Defendant Foster agrees (in front of a notary) that he would pay $134,000.00 after making a deposit of $75,000.00 through "accrued sales commissions and profit distribution." Here again, Defendant Foster knew that he never intended to allow for his commissions or distributions to be reduced to pay for his purported interest in Rubicon.

278.     Due to Foster's wrongful conduct, Dougherty did not discover Defendant Foster's fraud until early 2022.

**DEFENDANT JOHN AND DEFENDANT FOSTER'S SCHEME TO DRAFT THE SHAM "RUBICON OPERATING AGREEMENT" TO SUIT THEIR OWN FINANCIAL BENEFIT**

279.     In or about April 2019, Defendant Foster directed his attorney to prepare the draft of the Rubicon Operating Agreement.   This action was in violation of the PTA which provided that Rubicon' attorney would draft its Operating Agreement.

280.     The so-called "Operating Agreement" is a sham; it is a part of the ploy, executed without consideration paid by Foster, and with disregard of Kevin's controlling interest.     The "Operating Agreement" was designed to cloak Defendants' fraudulent acts with the appearance of legitimacy.

281.     For his part Defendant Foster seized on the opportunity to essentially draft the Rubicon Operating Agreement to allow him to be the majority ruling shareholder of Rubicon using his business experience and legal professionals without meaningful opposition.

282.     Neither Foster nor his attorney disclosed the conflict of interest of preparing the draft of the operating agreement to Dougherty or any other Rubicon members.

283.     On July 3, 2019, Defendant Foster and his attorney had finished the final draft of the Rubicon Operating Agreement.

284.     On or about July 3, 2019, Defendants Foster and John directed the same to be sent over interstate wires knowing that it had been designed to fraudulently procure windfalls for themselves while defrauding Dougherty out of his rights to repayment of debts/contributions. Dougherty discovered the nature and scope of this fraud in early 2022.

285.     In short, the Rubicon OA was not an agreement at all but part of the schemes by John and Foster to defraud Dougherty.

***The Specific Schemes and Frauds of the Rubicon Operating Agreement***

286.     The overarching schemes and frauds perpetrated by Defendants Foster and John through the Fraudulent Rubicon Operating Agreement were:

a.  to fraudulently assert that Defendant Foster was going to pay for, and Rubicon was going to sell 4% of its interest to Defendant Foster, however, Rubicon did not own 4% of its own interest and the same was a ruse to line Defendant John's pockets;

b.  to provide Defendant Foster purported supermajority managerial powers notwithstanding he allegedly "owned" less Rubicon interest than Dougherty and Defendant John respectively;

c.  to allow Defendant Foster to make the highest commissions which would be the difference between Rubicon's lowest possible "wholesale" price and the price he alone set for resale to the end user;

d.  to allow Defendant John to continue to manipulate Rubicon's books for his own financial benefit;

e.  to allow Defendant John to "hold and own" real property belonging to Rubicon which provided the avenue to purchase real property in Rubicon's name and transfer it into his granddaughters' trust, the Maddy Burke Revocable Trust, of which he was the trustee;

f.  for both Defendant Foster and Defendant John to attempt to erase the past debts/contributions by Dougherty or make it impossible for him ever to be repaid;

g.  to allow Defendant John to launder money through Rubicon to conduct research and development of other products for a separate company owned by him; and

h.  to allow Defendant John to have the authority to continue to pay Defendants Mueller Prost, Richars, and Grant Cole, LLC as Rubicon's business advisors, consultants, bookkeepers and accountants.

287.  In order to accomplish the above schemes, the following non-exhaustive list of Sections from the Rubicon Operating Agreement were drafted, designed and agreed upon by

Defendants Foster and John to either provide an alleged "contractual" basis as cover for their illegal conduct or, alternatively, create such ambiguity in the language of the Agreement to form an arguable plausible basis for them taking certain fraudulent actions.

### *Wire Fraud Regarding the Execution of the Rubicon OA by Dougherty*

288.    On or about July 3, 2019, based upon Defendant John's representations to Dougherty that the same was fair and would provide for Rubicon to be profitable such that Dougherty would make money and have his debts repaid, Dougherty executed the Operating Agreement.

289.    Upon information and belief, not all members of Rubicon having membership interest executed the Rubicon Operating Agreement.

290.    Prior to the execution of the Rubicon OA, Dougherty had never received a copy of Exhibit "A" thereto until the final draft was sent to him.

291.    Even upon receipt of Exhibit A, the same did not allow for Dougherty to discover that Defendant John was running a Ponzi-like scheme from 2014 through 2019 by providing new members their full interest by diluting older members.

292.    In other words, as reflected in the spreadsheets/CAP Tables prepared by Defendant John (with the assistance of Defendants Mueller Prost, and Richars) and transmitted over interstate wires in January and February 2022 to potential new investors, a new member's interest would be diluted by even newer members coming into the company until they were meaningless.

293.    At that time when Dougherty confronted Defendant John about the membership interest list of Rubicon in or about July 2019, Defendant John told him he would not only get repaid all of the money he had loaned but now Dougherty will end up making more money because Defendant Foster was coming into Rubicon as an owner/partner which would lead to equity distribution of the sales of Rubicon's products.

**2019 - 2022 SCHEMES, FRAUDS AND TORTIOUS CONDUCT AFTER JULY 2019**

294.     After the purported execution of the Rubicon OA, the various Defendants committed schemes, frauds and tortious acts as detailed in the following *non-exhaustive* chronology.

**AUGUST 2019 – 18 U.S.C. § 1956 LAUNDERING OF MONETARY INSTRUMENTS REGARDING PURCHASING OF LAND WITH RUBICON FUNDS:**

295.     Upon his execution of the Rubicon OA, Defendant Foster did not contribute $215,000.00, and upon information and belief, only provided $75,000.00 as a down payment.

296.     Upon receipt of Defendant Foster' down payment, in July or August 2019, Defendant John went forward and purchased a parcel of land in Missouri with funds specifically allocated for Rubicon's alleged 4% interest.

297.     In addition to the unauthorized use of Rubicon funds, Defendant John also used monies that were loaned to Rubicon by Defendant Richars' company, Short Term Lending, to accomplish the real estate closing on the Subject Land Parcel.

298.     More specifically, in in 2019 Defendants John and Richars drafted a second $40,000.00 loan from Defendant Short Term Lending to Rubicon which indicated that Dougherty was a purported debtor, not just a guarantor.  ("Second Short Term Lending Loan").

299.     Defendant John stated to Dougherty over interstate wires that his signature was necessary to procure the loan.

300.     The Second Short Term Lending Loan was executed and funded while Defendant Richars was a Partner of Defendant Mueller Prost and while Short Term Lending's principal place of business was at Defendant Mueller Prost Headquarters.

301.     Upon closing on the parcel of land, Defendant John fraudulently transferred the property from Rubicon into the Maddy Burke Revocable Trust – a trust with a single beneficiary – Defendant John's granddaughter.

302.     These transactions were explicit violations of representations made to Dougherty relative to repayment for debts owed to him and of the December 14 Promissory Note where Dougherty was to receive payment as a secured creditor or Rubicon.

303.     Defendant John violated 18 U.S.C. § 1956, Laundering of Monetary Instruments by purchasing the land with Rubicon funds in the name of Rubicon, and thereafter, executing a Quit-Claim Deed to the Maddy Burke Revocable Trust, which he controlled.

**APRIL 1, 2020 - WIRE FRAUD BY DEFENDANT FOSTER:**

304.     On April 1, 2020, after the execution of the Rubicon RA, Defendant Foster notified Defendant John that he would "quit" Rubicon if he did not get paid his full commission, meaning he thereafter would refuse to pay any outstanding amounts for his purported interest in Rubicon.

305.     Defendant Foster made this statement over interstate wires to defraud Rubicon out of approximately $100,000.00 while, at the same time, maintaining all of his purported rights as co-manager of Rubicon.

306.     Defendant Foster's statements were for purposes of his financial benefit and caused Dougherty substantial damages.

**APRIL 1, 2020 – WIRE FRAUD BY DEFENDANT JOHN:**

307.     In response to Defendant Foster's threat, on or about April 1, 2020, Defendant John agreed over interstate wires to fraudulently pay the balance owed on Defendant Foster's purported Rubicon interest out of Rubicon's bank account funds which were comprised of Dougherty's capital contributions and revenue from the sale of Nite Track Devices.

308.     This "arrangement" between Defendant John and Foster made over interstate wires directly damaged Dougherty as any Rubicon funds would have otherwise rightfully been paid to him for substantial outstanding debts as alleged herein, as well as, for distributions of company profits.

309.     In a correspondence Defendant John drafted in late 2021 ("2021 Correspondence") he confirmed that he agreed to defraud Dougherty and Rubicon by paying for Defendant Foster's debt for his alleged Rubicon interest with Rubicon funds.

310.     The 2021 Correspondence states in relevant part:

> On April first of 2020, [Defendant Foster] threatened to quit selling Nite Track because he was tired of not receiving commissions.  I agreed to let Neal begin collecting his commissions in April of 2020 even though our operating agreement drawn up by his own attorney, specified in the agreement that each commission of his be applied to stock purchase pay down until paid in full.

**WIRE FRAUD IN THE 2021 CORRESPONDENCE BY DEFENDANT JOHN:**

311.     Defendant John sent the 2021 Correspondence to third parties over interstate wires fraudulently attempting to lay the blame for Rubicon's financial.

312.     Additionally, in the 2021 Correspondence, Defendant John fraudulently states that Dougherty agreed to Rubicon paying down Defendant Foster's debt owed his purported interest in Rubicon equity.

313.     Further, Defendant John fraudulently stated in the 2021 Correspondence that if Rubicon was getting a steady flow of Nite Track orders, it would be able to distribute profits and that commission payments for Nite Track sales was never Rubicon's business model.

314.     All of the statements made by Defendant John in the 2021 Correspondence were knowingly false and made for the purpose of luring additional investors into giving Defendant John more money.

**2020 - PRESENT – WEB-BASED SALES FRAUD SCHEME BY DEFENDANT FOSTER AND DEFENDANT JOHN:**

315.     Dougherty paid to have the Original Rubicon Website designed in approximately early 2017 and hosted online which contained an e-commerce portal for Nite Track sales.

316.     After Defendant Foster allegedly purchased Rubicon equity, he claimed to Dougherty that the Original Rubicon Website was inadequate and needed to be redesigned by a company he selected.  Dougherty paid for 50% of the Second Rubicon Website.

317.     In Defendant John's 2021 Correspondence, he states in relevant part:

> Neal and Kevin paid to have a website established through some web folks that Neal knew who also represented maintained websites (sic) for large industry players such as Yamaha Marine and others.  Neal also asked and we granted, to bring a social media rep on board from $1,000.00 a month (which Dougherty paid for out of his own pocket) which he claimed would increase our web sales.  These web sales were sales of our website which are charged full retail price of $4,199.00. The "deal" was that Neal and Kevin were supposed to share these commissions.   Neal took everyone except one, which I took as the buyer had called me on the phone at our office to inquire about Nite Track.  I referred him to our website.  As of today, we have 22 web sales, 10 of which ($22,000.00) should have gone to Kevin.

318.     Defendant Foster fraudulently promised over interstate wires to share all web sales of Nite Track commissions with Dougherty.  Dougherty agreed and relied upon Defendant Foster's promise.

319.     After making this Agreement with Dougherty over interstate wires, Defendant Foster failed to split website-based sales with Dougherty.

320.     At the direction of Foster, the Second Rubicon Website was programmed to direct all sales commissions to *only* Foster, and none to Dougherty.

321.     Dougherty did not receive any sales commissions from the Second Rubicon Website.

322.     Upon information and belief, Foster receives payment of sales commissions from the Second Rubicon Website, through Foster's Marine and Intense Fishing, which are both companies that Foster controls.

323.     To date, Defendant Foster continues to make sales through Rubicon's Nite Track website, www.GoNiteTrack.com, and his company, Foster Marine's website advertises Nite Track Devices with a link to the Nite Track website.   Since 2021, all revenues procured for Nite Track

devices have been directed to a bank account owned or controlled by Foster or Foster's Marine, or is within the control of Defendant John.  Additionally, since March 2022, upon information and belief, Defendant John has knowledge that Defendant Foster makes website-based sales and that Rubicon, or another entity, continues to manufacture Nite Track devices whereby he and Defendant Foster continue to profit at the expense of Dougherty.

324.     Defendants Foster and John accomplished the scheme of failing to pay Dougherty for web-based sales through wire fraud in violation of 18 U.S.C. § 1343 Federal Wire Fraud.

**18 U.S.C. § 1512 FEDERAL WITNESS TAMPERING BY DEFENDANT FOSTER:**

325.     In late 2021 or early 2022, Dougherty discovered information that led him to investigate the conduct of Defendant John also Defendant Foster with respect to their conduct and the affairs of Rubicon.   During this time, Dougherty had conversations with Defendant John which led him to believe that Defendant Foster was responsible for wrongdoings to Rubicon.

326.     Similarly, Dougherty had conversations with Defendant Foster who accused Defendant John of wrongful conduct in conducting the affairs of Rubicon.

327.     **INCIDENT ONE:** On January 28, 2022, Dougherty, Defendant John and others were on a conference call with Defendant Foster.

328.     During the call, Dougherty and Defendant John were in Missouri and Defendant Foster was in Alabama.

329.     One of Dougherty's intentions was to gather information as to what claims may exists relative to either Defendant John or Foster's conduct.

330.     During this call over interstate wires, Defendant Foster threatened to "kill" Defendant John referring particular torture of being covered with hot wax and burned on a cross.  Defendant John was and is a witness to Dougherty's claims and potential claims against Defendant Foster.

331.     Upon information and belief, it was Defendant Foster's intent in threatening Defendant John to subvert Dougherty's civil claims and intimidate Defendant John relative to participating in any proceedings relative to the claims set forth herein.

332.     **INCIDENT TWO:** On or about February 10, 2022, Defendant Foster directed a phone call over interstate wires to Dougherty in Florida and Defendant John in Missouri.

333.     During this communication, Defendant Foster threatened Dougherty with violence and conduct likely to cause great bodily harm or death.  More specifically, Defendant Foster threatened to "kill" Dougherty by bashing his head on the concrete until his brains were exposed and then cut his heart out.

334.     This incident was reported to the Jefferson County Sheriff's Office and an incident report documented the conduct.

335.     Upon information and belief, it was Defendant Foster' intent in threatening to "kill" Dougherty and others was to subvert Dougherty's civil claims and intimidate witnesses relative to participating in any proceedings relative to the claims set forth herein.

336.     **INCIDENT THREE:** In March 2022, Defendant Foster threatened Dougherty over interstate wires with violence and great bodily harm.

337.     Upon information and belief, it was Defendant Foster's intent in threatening Dougherty to intimidate Dougherty from bringing any civil claims against Defendant Foster and intimidate witnesses relative to participating in any proceedings relative to the claims set forth herein.

338.     Also, upon information and belief, Defendant John had knowledge of and/or otherwise supported Defendant Foster' threats to Dougherty in March 2022.

## JULY 2019 - PRESENT – FRAUDULENT DISTRIBUTIONS THROUGH WIRE FRAUD SCHEMES BY DEFENDANTS' JOHN, R. TOTSCH, AND RICHARS:

339.     However, from July 2019 onwards, Defendant John unilaterally paid distributions, reimbursements and/or other payments to other purported Rubicon interest members, such as

Defendant R. Totsch and Roberts – without Dougherty's knowledge or approval thereby defrauding Dougherty of promised repayment and for otherwise owed company distributions.

340.     Defendant John accomplished paying these fraudulent monies to Defendant R. Totsch, Roberts and others through interstate wires in violation of 18 U.S.C. § 1343.

## 2019 - PRESENT – OTHER WIRE FRAUD BY DEFENDANTS MUELLER PROST, GRANT COLE AND RICHARS

341.     For his part, Defendant Richars prepared Rubicon's tax returns and K-1s knowing that distributions were being made to Defendants R. Totsch, Roberts and others while debts were owed to Dougherty, one of which he and Mueller Prost prepared for Defendant John in the form of the December 14, 2016 Promissory Note.

342.     These K-1 Forms were sent by, or at the direction of, Defendants John, Mueller Prost and Richars over interstate wires.

## 2020 - PRESENT – WIRE FRAUD "ROYALTY" SCHEME BY DEFENDANT JOHN:

343.     Subsequent to the execution of the fraudulent Rubicon OA, upon information and belief, in 2020, Defendant John announced over interstate wires that he was going to take a percentage of every Rubicon sale for a personal royalty.

344.     From 2014 through late 2019, Defendant John had never mentioned to Dougherty that he intended to skim additional funds from their business to pay himself a royalty fee for allegedly creating the Nite Track device.

345.     For example, pursuant to a January 14, 2022, Rubicon financial printout that was transmitted over interstate wires, the following represent the "royalties" Defendant John paid to himself in 2021 alone – all-the-while- Dougherty remained defrauded out of millions of dollars:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 12:49 PM | | | | **Rubicon Products, LLC** | | | | | |
| 01/14/22 | | | | **Transaction Detail By Account** | | | | | |
| Accrual Basis | | | | **January through December 2021** | | | | | |

| Type | Date | Num | Name | Memo | Clr | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **50000 · Cost of Goods Sold** | | | | | | | | | |
| **51554 · Royalties Expense** | | | | | | | | | |
| Check | 01/06/2021 | 8104 | John W. Totsch | December 20... | | 10350 · Lindell ... | 1,650.00 | | 1,650.00 |
| Check | 01/06/2021 | 8165 | Short Term Lending ... | 40K Note | | 10350 · Lindell ... | 1,999.00 | | 3,649.00 |
| Bill | 02/02/2021 | Jan 20... | John W. Totsch | January 2021 ... | | 10350 · Accou... | 3,225.00 | | 6,874.00 |
| Bill | 02/26/2021 | royalties | John W. Totsch | Feb 2021 Roy... | | 20000 · Accou... | 1,350.00 | | 8,224.00 |
| Check | 04/02/2021 | 8246 | John W. Totsch | March 2021 R... | | 10350 · Lindell ... | 3,225.00 | | 11,449.00 |
| Check | 04/26/2021 | 1011 | John W. Totsch | Direct Deposit... | | 10350 · Lindell ... | 3,300.00 | | 14,749.00 |
| Check | 05/03/2021 | Direct | John W. Totsch | Tideline-Cam... | | 10350 · Lindell ... | 525.00 | | 15,274.00 |
| Check | 06/02/2021 | 1053 | John W. Totsch | Royalties for ... | | 10350 · Lindell ... | 2,025.00 | | 17,299.00 |
| Bill | 07/02/2021 | Royalt... | John W. Totsch | June Royalties | | 20000 · Accou... | 1,650.00 | | 18,949.00 |
| Check | 08/03/2021 | DD8368 | John W. Totsch | July Royalties | | 10350 · Lindell ... | 1,575.00 | | 20,524.00 |
| Check | 09/02/2021 | DD1122 | John W. Totsch | August 2021 ... | | 10350 · Lindell ... | 1,575.00 | | 22,099.00 |
| Check | 11/05/2021 | DD1163 | John W. Totsch | Sept 2021 Ro... | | 10350 · Lindell ... | 750.00 | | 22,849.00 |
| Bill | 11/29/2021 | Oct R... | John W. Totsch | October 2021 ... | | 20000 · Accou... | 1,200.00 | | 24,049.00 |
| Bill | 12/03/2021 | Nov Roy | John W. Totsch | November 20... | | 20000 · Accou... | 1,200.00 | | 25,249.00 |
| Bill | 12/22/2021 | Partial... | John W. Totsch | Partial of Dec... | | 20000 · Accou... | 1,725.00 | | 26,974.00 |
| | | | | | | | | | |
| Total 51554 · Royalties Expense | | | | | | | 26,974.00 | 0.00 | 26,974.00 |
| Total 50000 · Cost of Goods Sold | | | | | | | 26,974.00 | 0.00 | 26,974.00 |
| **TOTAL** | | | | | | | 26,974.00 | 0.00 | 26,974.00 |

A copy of the January through December 2021 Transaction Detail is appended hereto marked **Exhibit "H."**

346.     Upon information and belief, Rubicon continues to sell Nite Track devices through the Nite Track website, the Foster Marine website, social media outlets and, thus, through interstate wires while fraudulently failing to pay Dougherty for same or otherwise make distributions to Dougherty at the direction of Defendants John, Foster and Richards without account for the same to Dougherty.

347.     Using interstate wires, Defendant John continues to illegally collect monies for "royalties" for these Nite Track Devices.

## 2021 - PRESENT – MONEY LAUNDERING FOR "RESEARCH AND DEVELOPMENT" OF ANOTHER PRODUCT AND DEVICE BY DEFENDANT JOHN WITH KNOWLEDGE OF DEFENDANT RICHARS:

348.     Upon information and belief, prior to 2021, Defendant John informally or formally established a new company named Redline wherein he began working on a new project and new product that would use some of the same components of the Nite Track Device ("Illegal Device").

349.     Initially, Defendant John intentionally failed to inform Dougherty that he was going to start a new company and that he was using monies coming into Rubicon to pay for "research and development" of Redline's Illegal Device.

350.     From 2020 through present, Defendant John routinely and clandestinely transferred substantial money from Rubicon to Redline or another separate entity or entities from Rubicon's operating account under the guise of "research and development".

351.     For example, pursuant to Rubicon's December 31, 2021 Balance Sheet (which was transmitted over interstate wires at the direction of Defendant John and Defendant Richars) ("December 2021 Balance Sheet"), Defendant John claims Rubicon spent over $140,000.00 for research and development of a product otherwise unknown to Dougherty.  A copy of the December 31, 2021, Balance Sheet is appended hereto marked **Exhibit "I."**

352.     By transferring Rubicon funds into himself and/or separate corporate vehicles for his own personal benefit, Defendant John violated 18 U.S.C. § 1956.

353.     Upon information and belief, Defendant Richars had knowledge of Defendant John's plan to develop a new product and knowledge that Defendant John used Rubicon's trade secrets and monies illegally.  Moreover, upon information and belief, Defendant Richars accepted the prospect of an equity position in Defendant John's new company.

**DECEMBER 2021 – WIRE FRAUD BY DEFENDANT JOHN: THE FRAUDULENT MEMORANDUM OF UNDERSTANDING:**

354.     On or about December 23, 2021, Defendant John caused to be transmitted over interstate wire to third parties a Memorandum of Understanding" ("December 2021 Fraudulent MOU") with the intent to defraud them into investing money into his "new" company Redline.

355.     The December 2021 Fraudulent MOU also was directed to defraud Dougherty by removing assets and revenue streams from Rubicon to Defendant John's new company Redline and thereby extinguishing Dougherty's ability to be repaid for his loans and for profit distributions that would otherwise be paid through Rubicon.

356.     Defendant John intimated that this new company would be allowed to use, free of any claims, Rubicon's assets, to develop "technology for the purpose and use for a product that provides

specialty lighting systems /cameras- for marine vessel applications and other applications and uses of the technology and product lines, which have not been fully identified yet developed." *See* **Exhibit "J", Memorandum of Understanding.**

357.     Additionally, Defendants John and Richars stated over interstate wires through the Memorandum of Understanding and other interstate wire communications directly with third parties, that **Defendant Richars would own ten percent (10%) of the new company**.

**2016 - PRESENT – DEFENDANT JOHN'S FRAUDULENT SECRET AGREEMENT BETWEEN HIMSELF AND WATEC, THE UNITED STATES DISTRIBUTOR OF THE LENS USED IN THE NITE TRACK CAMERA:**

358.     Upon information and belief, Defendant John surreptitiously entered into a secret agreement that leaves the Nite Track product without a means of production ("Watec Agreement").

359.     The Watec Agreement is an asset of Rubicon.

360.     Specifically, a critical component to the Nite Track camera is a lens created by a Japanese company, Watec.

361.     In 2016, Defendant John repeatedly represented to Dougherty that Rubicon had an "exclusive" agreement with Watec's distributor, Jason Williams, for the lens.

362.     Dougherty relied on Defendant John's representations and believed that the Nite Track was protected from copycats because of the exclusive rights to the Watec lens.

363.     Dougherty became aware of this purported exclusive distribution agreement between Defendant John and/or Redline with Watec when he discovered a competing product that uses the same lens.

364.     In late 2021 or early 2022, Dougherty discovered that not only was there no "exclusive" agreement for the use of the lens between Rubicon and Watec, but there was a "secret" ten to twelve (10-12) page exclusive agreement between Defendant John and/or another entity controlled by him.

365.     From 2015 onwards, there are numerous substantial financial disbursements from Rubicon to Watec signed by Defendant John on behalf of Rubicon.

366.     Dougherty demanded a copy of this "agreement" and Williams, thus Watec, refused to provide Dougherty a copy of the "secret" agreement.

367.     In reality, Defendant John was paying for *his personal* secret exclusive contract with Watec using Dougherty's financial contributions to continually line his own pockets and those of his co-conspirators.

368.     Moreover, this "secret" agreement provided Defendant John the only means to obtain the most significant piece of the Rubicon product, *and also* allowed Defendant John to develop his competing products for his Redline company which further damage Dougherty.

369.     Defendant John, and Defendant Foster, are currently using the secret exclusive agreement which belongs to Rubicon to profit from interstate Nite Track sales while fraudulently failing to renumerate Dougherty.

**INTELLECTUAL PROPERTY ASSIGNMENT WIRE FRAUD BY DEFENDANT JOHN**

370.     Dougherty and Defendant John had initially submitted a patent application for Rubicon's Nite Track Device.

371.     Patent rights were granted on April 28, 2018, and were assigned to Rubicon on May 1, 2018.

372.     This assignment was recorded by the USPTO on May 8, 2018.

373.     Defendant John convinced Dougherty to assign the patents to Rubicon, claiming that it was necessary for the success of the company.

374.     In 2022, in an effort to extricate himself, in part, from substantial claims owed to Dougherty, Defendant John agreed to assign Rubicon's intellectual property to Dougherty, including the Rubicon Patent.

375.    On January 28, 2022, Defendant John knowingly and voluntarily signed patent assignment under oath and penalty of perjury in front of a notary public.

376.    At the time Defendant John signed the assignment—under oath—on January 28, 2022, he knew he was committing perjury as he knew he would disavow the assignment and fraudulently claim that signed it under duress.   A copy of same is appended hereto marked **Exhibit "K."**

377.    On February 23, 2022, Defendant John signed under oath and penalty of perjury in front of a notary public Dougherty's "Notice of Foreclosure of Debt/Official Demand Letter" wherein Dougherty agrees to accept assignment of the patent as partial satisfaction of the debt. A copy of same is appended hereto marked **Exhibit "L."**

## DOUGHERTY'S MAJORITY INTEREST IN RUBICON

378.    Based on the foregoing, Dougherty maintains that he holds a majority interest in Rubicon derived from Dougherty's original interest of 40%, the interest acquired from Araujo of 20% by assignment, and the 40% security interest acquired as a result of the December 2016 $200,000.00 promissory note wherein Defendant John pledged his Rubicon interest as collateral.  Said obligation which remains in default.

## THIS ACTION FOLLOWS

379.    This action seeks relief against various parties who defrauded Dougherty personally and continue to do so by way of ongoing tortious conduct. This action does not seek redress for harm to Rubicon.

380.    All conditions precedent to the filing of the claims herein have either occurred, been satisfied or been waived.

381.    Due to the conduct of Defendants, Dougherty has retained undersigned counsel to prosecute this action and has agreed to pay reasonable attorneys' fees and costs.

382.     All causes of action herein are alleged in addition or in the alternative to other causes of action.

## COUNT I - DECLARATORY JUDGMENT (under Rule 57, 28 U.S.C. § 2201, or Florida Statutes Chapter 86)

*Against John Totsch, Richard Totsch, Curtis Neal Foster, Intense Fishing LLC, Foster's Marine LLC, and Rubicon Products LLC*

383.     Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

384.     This is an action for a declaratory judgment against Defendants JOHN TOTSCH, RICHARD TOTSCH, CURTIS NEAL FOSTER, INTENSE FISHING LLC, FOSTER'S MARINE LLC, and RUBICON PRODUCTS LLC.

385.     In view of the acts of the Defendants and their fraudulent operation of Rubicon, Dougherty is in doubt as to his legal rights as to the following:

    a.   that the nature and value of Dougherty's membership interest in Rubicon is a majority interest based on his initial interest, his interest acquired from Araujo, and his 40% interest acquired from Defendant John's share by way of the default on the $200,000.00 promissory note— Dougherty's position is that he owns a majority of Rubicon's equity;

    b.   Dougherty's rights to access Rubicon's bank accounts, books, records, websites, online accounts of any kind and/or intangible property, to the exclusion of the other Defendants—Dougherty's position is that he is entitled to unfettered access to Rubicon, to the exclusion of the other Defendants based on Dougherty's interest and Defendants' ongoing fraud and exploitation of Rubicon and Dougherty;

    c.   that the Watec Agreement is an asset of Rubicon that must be transferred or assigned to Rubicon by Defendant John—this is Dougherty's position;

d.  that, in view of John's execution of the January 28, 2022, patent assignment, the patent is an asset of Dougherty's that must be restored to Dougherty despite John's subsequent disavowal of the patent assignment and transfers—this is Dougherty's position; and

e.  that the land, the res in the Maddy Burke Revocable Trust, must be transferred via warranty deed to Dougherty because the Maddy Burke Revocable Trust's acquisition of the land was the result of Defendant John defrauding Dougherty out of the funds used to make such purchase in the name of Rubicon, then transferring the land to said trust without authorization—this is Dougherty's position.

386.  The Defendants dispute Dougherty's positions set forth above.

387.  As such, there is a bona fide, actual, present, and practical need for a declaration of the rights and legal relations of Dougherty concerning the matters in the paragraph above.

388.  The declaration sought involves a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

389.  Dougherty's rights in Rubicon depend on the facts alleged herein or the law that applies to the facts.

390.  All antagonistic and adverse interests are before the Court.

391.  The relief sought herein is not the nature of an advisory opinion; rather, Dougherty has a present need for an immediate declaration to resolve factual and legal disputes regarding the rights and legal relations between Dougherty and Defendants.

392.  In connection with this count, Dougherty seeks supplemental or further relief, including an award of damages, and/or other equitable relief once the Court determines the parties' respective rights and interests.

**WHEREFORE**, Plaintiff, Kevin Dougherty, respectfully requests that the Court declare the respective rights of the Dougherty and these Defendants, JOHN TOTSCH, RICHARD TOTSCH, CURTIS NEAL FOSTER, INTENSE FISHING LLC, FOSTER'S MARINE LLC, and RUBICON PRODUCTS LLC, as to the matters alleged within this Count, as follows: that the Court enter declarations as to any other matter involving the parties' relationship and dealings, that the Court enter an award of damages as supplemental relief for Dougherty; and award Dougherty costs, attorneys' fees, and such other relief the Court deems just and proper.

<u>**COUNT II - VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("CIVIL RICO") PURSUANT TO 18 U.S.C. § 1962(c) and 18 U.S.C. § 1964 (c)**</u>

***Against John Totsch, Richard Totsch, Terry Richars, Mueller Prost PC, Curtis Neal Foster, and John Doe(s)***

393.    Dougherty realleges Paragraphs 1 through 382 as if fully set forth herein.

394.    This is an action for damages pursuant to 18 U.S.C. § 1962(c) "Civil Racketeering" against Defendants JOHN TOTSCH, RICHARD TOTSCH, TERRY RICHARS, MUELLER PROST PC, CURTIS NEAL FOSTER, and JOHN DOE(S) (hereinafter "RICO Defendants").

<u>**The Applicable Statutes**</u>

395.    This is a civil racketeering action for civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to 18 U.S.C. 1962(c) and 18 U.S.C. 1964(c).

396.    Under 18 U.S.C. § 1962(c) it shall be unlawful for "any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt."  Under 18 U.S.C. § 1962(d), it shall be unlawful to conspire to violate any of the RICO substantive provisions, including section 1962(c).

397.     Federal Civil RICO, specifically 18 U.S.C. § 1964(c), creates a private right of action for any person injured in his business or property by reason of violation of § 1962 and provides for threefold the damages sustained as a result of recovery for the cost of suit including reasonable attorney fees.

**The Enterprise**

398.     Under Federal law, an "enterprise" is defined under 18 U.S.C. § 1961 as follows:

> **(4)** "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

399.     The RICO Defendants and others associated in fact such as entity non-RICO Defendants Rubicon, Intense Fishing, and Short Term Lending constitute an "Enterprise" associated in fact (the "Association in Fact Enterprise" or "Enterprise") as described in 18 U.S.C. §1961(4), which functioned for the purpose of defrauding Dougherty and other investors, such as Araujo who invested $100,000.00, based upon fraudulent valuations and information provided by John, Mueller Prost, Richars, investors in Rubicon, as well as other members who purchased Rubicon equity as alleged herein, based upon the same fraudulent information.  Additionally, John, and Richars, attempted to lure specific additional sales team members and potential investors to support Rubicon by providing sales support and/or investing for bogus equity positions in Rubicon or John's other entities.

400.     The Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce.

401.     The Enterprise had and has longevity, over 6 years, sufficient to permit each of the RICO Defendants to pursue the Enterprise's purpose.

402.     Each RICO Defendant and John Doe(s) conducted the affairs of the Association in Fact Enterprise or acted at the direction of Defendants John, Richars, Mueller Prost, or Foster in the conduct of the affairs of the Enterprise.

403.     Each corporate defendant in the Enterprise in Fact, specifically Mueller Prost, its successors, and Short Term Lending, and non-RICO Defendants Rubicon, Intense Fishing, Foster Marine, and Grant Cole were corporations with distinct identities and did not share a common or unified structure with each other. Thus, although each corporate entity Defendant associates with each other and with other members of the enterprise, they are "distinct" from the association in fact enterprise in which it participates.  Each corporate entity Defendant is ***not*** part of the same unified corporate structure and thus is distinct from an association of all of these entities and individuals.

**Functioning Together as Continuing Unit**

404.     At all times relevant to this Complaint, members and associates of the Association in Fact Enterprise functioned together as a continuing unit, with a common purpose for the economic benefit and gain of the RICO Defendants who controlled the Enterprise, as further described below.

405.     Each participant in the RICO Enterprise had systematic linkage to each other through corporate ties, contractual relationships, employment, financial ties and continuing coordination of activities.

406.     The Enterprise associates utilized Rubicon, Grant Cole, Intense Fishing, and Foster's Marine ("Associated Entities") as the vehicles for their racketeering activities.

407.     Non-RICO Defendant Rubicon is a legal entity controlled by Defendants John, R. Totsch, and Foster.

408.     Non-RICO Defendant Grant Cole is a legal entity controlled by Defendant Richars.

409.     Non-RICO Defendants Intense Fishing and Foster's Marine are legal entities controlled by Defendant Foster.

410.     The RICO Defendants ran their Enterprise by engaging in over twenty (20) acts of wire fraud – predicate activity in violation of 18 U.S.C. § 1343.

411.     Defendant John engaged in at least two (2) individual acts of money laundering in violation of 18 U.S.C. § 1956.

412.     Defendant Foster engaged in at least three (3) incidents of witness harassment and/or intimidation in violation of 18 U.S.C. § 1512.

413.     The RICO Defendants had the specific intent to participate in the overall RICO enterprise, which is evidenced by the schemes to defraud Dougherty and others as alleged hereinabove.

414.     Based upon the RICO Defendants' unlawfully obtaining, transmitting, and collecting monies through the use of interstate wirings issued in the Associated Entities' name, the same affected interstate commerce in furtherance of the racketeering schemes as alleged herein.

**Common Purpose**

415.     The members of the Enterprise banded together with the common purpose to enrich themselves at the expense of Dougherty and other unsuspecting investors.

416.     The RICO Defendants share the bounty of their criminal enterprise – by sharing the financial gain from their fraudulently obtained monies.

417.     The Defendants utilized Enterprise components including the Associated Entities as a vehicle for their racketeering activities.

**Operation and Management/Distinctness**

418.     In order to implement schemes successfully and convincingly to unlawfully steal from Dougherty and others, the RICO Defendants needed an organization and system that enabled them to effectively establish an aura of bona fide business operations, accounting and charges.

419.     The Enterprise provides that organization and system.

420.     While the RICO Defendants participated in- and are members of – the Enterprise, they have a separate existence from the Enterprise, as each individual RICO Defendant is different than the Enterprise which they direct, control and/or act willingly at the direction of another RICO Defendant.

421.     The Enterprise is an association of the RICO Defendants and Non-RICO Defendant Associated Entities and has operated since 2014.

**The Racketeering Violation**

422.      From on or before 2014 and continuing up through the date of the filing of this Complaint, the RICO Defendants, each of whom are persons associated with or employed by the Enterprise, did knowingly and unlawfully conduct, or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), all in violation of 18 U.S.C. § 1962(c).

423.     These Defendants have engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity after the effective date of the Federal RICO statute and also within 10 years of each individual act.

**Defendants' Commission of Specific Predicate Activity**

424.     From on or before 2014 to the present time, each RICO Defendant conducted the affairs of the Enterprise through the commission of multiple acts of racketeering as alleged in the General Allegations above.  Below are examples of those predicate acts alleged more specifically in the General Allegations hereinabove:

        a.  **WIRE FRAUD BY DEFENDANT JOHN**: On or about April 14, 2014, the filing articles of organization with the Missouri Secretary of State over interstate wires fraudulently misrepresenting the company's address to be Defendant R. Totsch's home address.

b. **WIRE FRAUD BY DEFENDANT R. TOTSCH**: Over interstate wires, from 2014 through present, Defendant R. Totsch caused to be broadcast fraudulent information on his personal LinkedIn social media account regarding his involvement in Rubicon for purposes of disguising fraudulent distributions of Rubicon funds made to him as legitimate business transactions.

c. **WIRE FRAUD BY DEFENDANTS JOHN AND R. TOTSCH**: Over interstate wires, on multiple occasions as alleged herein, from 2014 through at least February 2023, Defendants John and R. Totsch caused and directed Rubicon distributions to be paid to John, R. Totsch, Foster, Roberts and others thereby defrauding Dougherty out of monies owed to him by Rubicon.

d. **WIRE FRAUD BY DEFENDANT FOSTER**: Over interstate wires, from 2020 through present, Defendant Foster engaged in multiple acts of wire fraud by taking over online sales of Nite Track by fraudulently changing the administrative login to the Rubicon website such that Dougherty could no longer access the same and causing the monies derived from Nite Track into a bank account owned or controlled by Defendant Foster.  Thereafter, Defendant Foster transferred a portion of the sale proceeds over interstate wires to Defendant John which defrauded Dougherty out of monies owed to him for online sales and for monies owed to him by Rubicon.

e. **MONEY LAUNDERING AND WIRE FRAUD BY DEFENDANT JOHN, RICHARS, SHORT TERM LENDING AND MUELLER PROST**: By interstate wire, from 2018 through 2019, Defendant Richars transferred monies to Rubicon under the guise of a loan from Short Term Lending to Rubicon while acting as a partner of Mueller Prost.  Defendants Mueller Prost and Richars also provided the Fraudulent 2019 Valuation over interstate wires to provide material support to Defendant John to obtain monies from a new Rubicon investor.  Defendant John then purchased land in the name of Rubicon with these funds and monies and thereafter transferred the land from Rubicon to himself as Trustee of the Maddy Burke Revocable Trust while Defendant Richars and Mueller Prost kept the land on Rubicon's books of account and ledgers as an asset of Rubicon for purposes of defrauding Dougherty and others.

f. **WIRE FRAUD BY DEFENDANT JOHN AND RICHARS**: By interstate wires in November 2021, Defendant John, with the knowledge and/or consent of Defendant Richars sent a fraudulent Memorandum of Understanding to third parties misrepresenting the status of Rubicon's financials, and seeking to defraud both Dougherty and others, by failing to disclose Dougherty's equity ownership interest in Rubicon and outstanding loans owed to Dougherty.

g. **WIRE FRAUD**: By interstate telephone calls between June and July 2018, Defendant John made fraudulent statements to Dougherty into investing more funds into Rubicon, then using those funds, in part, for personal use, to buy a vehicle, and to start a new company and develop a competing product (Redline) using Rubicon's trade secrets and resources;

h. **WIRE FRAUD BY DEFENDANT JOHN**: On or about January 6, 2021, and in February 2021, Defendant John caused to be debited over interstate wires through the execution of Rubicon checks to pay the attorney's fees of Jennifer Wiley, a Rubicon employee and love interest of John, who was involved in a child support dispute.

i. **WITNESS INTIMIDATION BY DEFENDANT FOSTER**: By interstate wires, as alleged herein above, Defendant Foster, on three (3) separate interstate telephone conversations threatened death and serious bodily harm against Dougherty and other potential witnesses for purposes of dissuading the commencement of legal action or the participation in the same.

j. **WIRE FRAUD BY DEFENDANTS MUELLER PROST, RICHARS AND JOHN**: By interstate wires, and on multiple occasions over the course of over five years, from at least December 2016 through January 2022, these Defendants caused to be sent, *inter alia,* knowingly false Rubicon financial statements, ledgers, CAP Tables, Valuations and Profit and Loss Statements for purposes of defrauding Dougherty, other Rubicon members and potential investors as more specifically alleged hereinabove.

k. **PERJURY BY DEFENDANT JOHN**: Executing intellectual property assignments under oath on January 28, 2022, and again February 2022, transmitting them by interstate emails, all while knowing that Defendant John would later fraudulently assert that he executed the assignment under duress such as to attempt to negate the import of those assignments to defraud Dougherty;

l. **WIRE FRAUD BY DEFENDANTS MUELLER PROST AND RICHARS**: Creating and distributing over interstate wires on multiple occasions as alleged herein, knowingly inaccurate K-1 statements for tax years 2019, and 2020, and distributing a K-1 to an entity and individual that has no interest in Rubicon, to wit: Defendant Intense Fishing;

m. **WIRE FRAUD BY DEFENDANT MUELLER PROST AND RICHARS**: Creating a knowingly inaccurate valuations of Rubicon, such as the 2019 Fraudulent Valuation, and transmitting the same over interstate wires for purposes of defrauding Dougherty and others as alleged herein.

n. **DEFRAUDING DOUGHERTY AND THE USPTO BY DEFENDANT FOSTER**: Through interstate wires from March through at least May 2022, Defendant Foster directed his attorneys/agents, Attorney Anthony Amatong ("Attorney Amatong") and Amatong McCoy, to defraud the USPTO and Dougherty by transferring Dougherty's Attorney's Power of Attorney to that of Attorney Amatong with the intent to permanently deprive Dougherty of his rightful ownership of Rubicon's Patent and Patent Application.

**Schemes, Victims, and Injuries**

425.    The set forth in the general allegations above, this Count involves numerous schemes which were accomplished through a regular pattern and way of conducting the affairs of the enterprise through wire fraud and money laundering to defraud Dougherty and others.

**Pattern of Racketeering Activity**

426.    The course of conduct engaged in by the RICO Defendants satisfies both the "continuity" and "relationship" tests of racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).

427.    Dougherty alleges that the course of conduct engaged in by the RICO Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).

428.    Dougherty can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."

429.    All predicate acts had the same purpose of defrauding Dougherty and others, all for the personal enrichment of the Defendants and their associates.

**Closed Ended Continuity**

430.    Each Defendant committed a series of related predicate acts, i.e., from early 2014 through to present.  Thus, continuity may be shown under the doctrine of closed-ended continuity.

**Threat of Continuity (Open-Ended Continuity), in the Alternative**

431.    Alternatively, the acts of attempting to dupe new investors and continuing to commit numerous acts of wire fraud to accomplish defrauding Dougherty through stealing profits and commissions from web-based Nite Track Sales includes a threat of continuity where the RICO

Defendants have implemented an intentional scheme to defraud Dougherty, and—when the money runs out—others.

432.    The ongoing attempts to defraud unsuspecting business associates and the continued scheme to profit through web-based sales of Nite Track Devices through wire fraud creates the specific threat that the RICO Defendants will repeat their fraud, which damages Dougherty and others.

433.    Using wire email transmissions to fraudulently cause harm to Dougherty and others is the regular way of conducting the RICO Defendants' ongoing business through Rubicon and the new entity (not yet discovered), and the vehicle wherein the Individual RICO Defendants engaged in similar endeavors in the past and continue to do so today.

434.    The "regular way" of conducting the Defendants' business is through committing the predicate acts of wire fraud, money laundering, and witness intimidation.

435.    Additionally, the RICO Defendants continue to engage in at least the predicate act of wire fraud that harms Dougherty and others on a daily basis.

436.    The pattern of racketeering activity as set forth herein is established by the threat of continued activity as the RICO Defendants have directed associates throughout 2014 through the present to repeatedly engage in the same illegal and illicit activities described herein.

437.    Dougherty has specific knowledge of third parties who have been similarly defrauded or attempted to be defrauded through wire fraud.

438.    The RICO Defendants are involved in all the above-mentioned schemes, with similar methods of commission, to wit: deceiving and defrauding unsuspecting business associates into investing into a business that is operated for the purpose of funding Defendants' lifestyles, raiding the business of all of its assets, and then moving on to the next unsuspecting investor and/or business associate.

439.     The RICO Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Dougherty, and Dougherty is entitled to bring this action for **three times his actual damages**, as well as injunctive and equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**WHEREFORE**, Plaintiff, Kevin Dougherty, demands judgment as to this Count against RICO Defendants JOHN TOTSCH, RICHARD TOTSCH, TERRY RICHARS, MUELLER PROST PC, CURTIS NEAL FOSTER, and JOHN DOE(S) and for compensatory damages, treble damages, pre-judgment and post-judgment interest, attorneys' fees and costs incurred in bringing this action, and such other relief as this Court deems just and proper.


### COUNT III - CIVIL RICO CONSPIRACY –PURSUANT TO 18 U.S.C. § 1962 (CONSPIRACY TO COMMIT PROHIBITED ACTIVITIES)

*Against Defendants John Totsch, Richard Totsch, Terry Richars, Mueller Prost PC, Short Term Lending Solutions LLC, Curtis Neal Foster, Intense Fishing LLC, Foster's Marine LLC, and John Doe(s)*

440.     Dougherty realleges Paragraphs 1 through 382 as if fully set forth herein.

**The Conspiracy**

441.     Dougherty alleges that, commencing in or about 2014  and continuing until the present time, Defendants JOHN TOTSCH, RICHARD TOTSCH, TERRY RICHARS, MUELLER PROST PC, SHORT TERM LENDING SOLUTIONS LLC, CURTIS NEAL FOSTER, INTENSE FISHING LLC, FOSTER'S MARINE LLC, and JOHN DOE(S) (hereinafter "RICO Conspiracy Defendants"), conspired to violate 18 U.S.C. § 1962(c), all in violation of 18 U.S.C. § 1962(d).

442.     Each Defendant agreed that a conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering, consisting of the predicate activity as more fully described in Count II. Dougherty alleges that the conspiratorial objective of that mutual agreement was intended to defraud Dougherty and other unsuspecting business associates by refusing to comply

with applicable law, and by knowingly relying on false documents, such conspiratorial conduct violates 18 U.S.C. § 1962(d), i.e., to conspire or endeavor to violate any of the provisions of 18 U.S.C. § 1962(c).

443.    Each RICO Conspiracy Defendant intended to further the schemes to defraud, which as described in Count II were completed and satisfied by at least one substantive individual Defendant.

444.    As demonstrated in detail above, the RICO Conspiracy Defendants have engaged in numerous predicate racketeering acts in furtherance of the conspiracy, including wire fraud, all designed to defraud Dougherty and other victims of money and other property interests and to conceal the nature, source, and location of such proceeds.

445.    The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that each RICO Conspiracy Defendant not only agreed to the objective of conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

446.    The agreement to violate RICO with regard to each conspiracy defendant is as follows:

a. Defendant Foster has followed the direction of Defendant John and conspired with Defendant John to engage in multiple racketeering acts of mail fraud and wire fraud, described above, which Dougherty realleged and averred in this Count. As a result, Defendant Foster has intended to further the substantive violations of fraud, which were completed, and he adopted the goal of furthering or facilitating the criminal endeavor. Accordingly, Defendant Foster conspired to violate 18 U.S.C. § 1962(c), all in violation of 18 U.S.C. § 1962(d).

b. Defendants John, Intense Fishing, and Foster's Marine have followed the direction of Defendant Foster and conspired with Foster to engage in multiple racketeering acts of mail fraud and wire fraud described above, which Dougherty realleged and averred in this Count. As a result, Defendant John and Intense Fishing have intended to further the substantive violations of fraud,

which were completed, and they adopted the goal of furthering or facilitating the criminal endeavor. Accordingly, Defendants John, Intense Fishing, and Foster's Marine conspired to violate 18 U.S.C. § 1962(c), all in violation of 18 U.S.C. § 1962(d).

c. Defendant R. Totsch has followed the direction of Defendant John and conspired with Defendant John to engage in multiple racketeering acts of mail fraud and wire fraud described above, which Dougherty realleged and averred in this Count. As a result, Defendant R. Totsch intended to further the substantive violations of fraud, which were completed, and he adopted the goal of furthering or facilitating the criminal endeavor. Accordingly, Defendant R. Totsch conspired to violate 18 U.S.C. § 1962(c), all in violation of 18 U.S.C. § 1962(d).

d. Defendants Richars, Mueller Prost, and Short Term Lending have followed the direction of Defendant John and conspired with Defendant John to engage in multiple racketeering acts of mail fraud and wire fraud described above, which Dougherty realleged and averred in this Count. As a result, Defendants Richars, Mueller Prost, and Short-Term Lending have intended to further the substantive violations of fraud, which were completed, and he adopted the goal of furthering or facilitating the criminal endeavor. Accordingly, Defendants Richars, Mueller Prost, and Short-Term Lending conspired to violate 18 U.S.C. § 1962(c), all in violation of 18 U.S.C. § 1962(d).

**The Injury**

447.  As a direct and proximate result of the RICO Conspiracy Defendants' agreement that conspirators would violate 18 U.S.C. § 1962(c), Dougherty, and other victims described in Count II, have been and are continuing, directly and proximately, to be injured as set forth more fully above.

**WHEREFORE,** Plaintiff, Kevin Dougherty, demands judgment as to this Count against RICO Conspiracy Defendants JOHN TOTSCH, RICHARD TOTSCH, TERRY RICHARS, MUELLER PROST PC, SHORT TERM LENDING SOLUTIONS LLC, CURTIS NEAL FOSTER, INTENSE FISHING LLC, and JOHN DOE(S) for compensatory damages together with interest, attorneys' fees,

and costs for instituting and prosecuting the instant action and for such further relief as this Court deems just and proper.

## COUNT IV - FRAUDULENT INDUCEMENT/FRAUDULENT MISREPRESENTATION

### Against John Totsch and Rubicon Products LLC

448.    Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

449.    This is an action for fraudulent inducement/fraudulent misrepresentation against Defendants John Totsch and Rubicon Products LLC.

450.    Defendants John and Rubicon ("Fraud Defendants") made a series of false and material misrepresentations to Dougherty that induced Dougherty to enter into investing hundreds of thousands of dollars into Rubicon, which John then diverted and pocketed, even though Defendants John and Rubicon knew that they would not use those invested funds for their intended purpose.

451.    Had Dougherty been aware that these representations were false, Dougherty would have ceased investing further into Rubicon and providing Defendant John money for his personal life expenses.

452.    Similarly, had Dougherty been aware that Defendant John was using Rubicon as a front to dupe Dougherty into funding his ideas, his lifestyle, his vehicles, a parcel of real estate and other business ventures, Dougherty would have ceased all dealings with Fraud Defendants.

453.    Defendants John and Rubicon made fraudulent misrepresentations by affirmative communication and/or omission when they:

      a.   fraudulently concealed their improper use and theft of funds that were invested for business purposes;

      b.   fraudulently concealed that they were making distributions to John, R. Totsch and others;

c.  fraudulently concealed that Defendant John diverted Rubicon's funds to purchase land for himself through Rubicon that he surreptitiously transferred to the Maddy Burke Revocable Trust;

d.  fraudulently concealed they entered into a secret deal with Watec's distributor;

e.  fraudulently started a competing business using Rubicon's trade secrets and funds that Dougherty had invested; and

f.  fraudulently signed two intellectual property assignments to Dougherty when at the time of signing, Defendant John knew he would later (falsely) claim that he signed it under duress.

g.  Fraudulently concealing they allowed Defendant Foster and Attorney Amatong and Amatong McCoy to illegally remove the Thomas POA and replace it with that of Attorney Amatong and Amatong McCoy's POA with respect to the Intellectual Property/Patent Filings with the USPTO.

454.    Defendants John and Rubicon knew that their above misrepresentations and omissions were false and misleading.

455.    Defendant John and Rubicon intended to and did induce Dougherty to rely on their misrepresentations and omissions in that Dougherty continued investing funds into Rubicon, unaware that Defendant John was siphoning off funds for his own personal use, unaware that Rubicon had no exclusive rights to the Watec lens, and unaware that Defendant John was engaged in secret dealings.

456.    Had Dougherty been aware that Defendants John and Rubicon's fraudulent misrepresentations and omission, Dougherty would have refused to have any involvement with Defendants John and Rubicon.

457.    Dougherty suffered injury as a direct and proximate result of his justifiable reliance on Defendants' material misrepresentations and omissions as alleged herein.

458.    Dougherty demands punitive damages against the Fraud Defendants for their intentional and malicious conduct as alleged herein.

**WHEREFORE**, Plaintiff, Kevin Dougherty, demands a judgment as to this Count for damages against Defendants JOHN TOTSCH and RUBICON PRODUCTS LLC for the full amount of his actual damages, punitive damages, pre-judgment and post-judgment interest, attorneys' fees and costs, and for such further relief as this Court deems just and proper.

## COUNT V - AIDING AND ABETTING FRAUDULENT INDUCEMENT, FRAUDULENT MISREPRESENTATION, FRAUDULENT TRANSFER, AND CIVIL RICO

### *Against Curtis Neal Foster, Richard Totsch, Short Term Lending Solutions LLC, Intense Fishing LLC, and Foster's Marine LLC*

459.    Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

460.    This is an action against Defendants CURTIS NEAL FOSTER, RICHARD TOTSCH, SHORT TERM LENDING SOLUTIONS LLC, INTENSE FISHING LLC, and FOSTER'S MARINE LLC for aiding and abetting fraudulent inducement/fraudulent misrepresentation and the RICO Defendants in their respective schemes as alleged herein above.

461.    Defendants Foster, R. Totsch, Short Term Lending, Intense Fishing, and Foster's Marine aided and abetted Defendants John, Rubicon, and the RICO Defendants' schemes in defrauding Dougherty.

462.    Defendants Foster, R. Totsch, Short Term Lending, Intense Fishing, and Foster's Marine, through their respective positions, rendered substantial assistance and encouragement to Defendant John, Rubicon and the RICO Defendants in their fraudulent misrepresentations, concealments, and the Civil RICO Schemes alleged in Count II and in the General Allegations.

463.    But for the active or passive participation of Defendants Foster, R. Totsch, Short Term Lending, Intense Fishing, and Foster's Marine in the fraudulent misrepresentation, concealment,

fraudulent transfer, and Civil RICO Schemes, the same would not have succeeded, and Dougherty would not have been victimized by the RICO Defendants and others.

464.    These Defendants failed to institute adequate policies and procedures to monitor and prevent the very type of fraud and schemes that occurred as alleged herein.

465.    These Defendants had actual or constructive knowledge of the fraudulent misrepresentations against Dougherty as alleged herein, and they played vital roles in the success and maintenance/expansion of the fraudulent malfeasance by agreeing to assist in the fraudulent misrepresentation, concealment, fraudulent transfer, and Civil RICO Schemes that damaged Dougherty.

466.    As a direct and proximate result of the conduct of Defendants Foster, R. Totsch, Short Term Lending, Intense Fishing, and Foster's Marine, they are liable for damages caused to Dougherty through Defendants' fraudulent actions and omissions.

467.    Dougherty demands punitive damages for these Defendants willful and malicious conduct.

**WHEREFORE**, Plaintiff, Kevin Dougherty, demands judgment for damages against Defendants CURTIS NEAL FOSTER, RICHARD TOTSCH, SHORT TERM LENDING SOLUTIONS LLC, INTENSE FISHING LLC, and FOSTER'S MARINE LLC for the full amount of his actual damages, punitive damages, pre-judgment and post-judgment interest, costs, and for such further relief as this Court deems just and proper.

## COUNT VI - AIDING AND ABETTING FRAUD

### *Against Mueller Prost PC, Wipfli Financial Advisors LLP, and Grant Cole CPA LLC*

468.    Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

469.     This is an action for aiding and abetting against Defendants MUELLER PROST PC, its successors in interest, e.g., WIPFLI FINANCIAL ADVISORS LLP, and GRANT COLE CPA LLC.

470.     Defendants Mueller Prost and Grant Cole aided and abetted Defendants John and Richars in carrying out their fraudulent scheme against Dougherty.

471.     Defendant Wipfli acquired Defendant Mueller Prost in June 2021 and, upon information and belief, all claims that existed prior to that date against Mueller Prost are actionable as against Defendant Wipfli as the successor in interest to Mueller Prost, including Aiding and Abetting the fraud committed by Richars and Mueller Prost as alleged herein.

472.     Among other things, Defendants Mueller Prost and Grant Cole rendered substantial assistance and encouragement to Defendants Richars and John including, but not limited to:

   a.  preparing and emailing knowingly false documents that misrepresented Dougherty's interest in Rubicon;

   b.  concealing Defendant John's improper use of Dougherty's funds from Dougherty;

   c.  conducting bookkeeping for Rubicon, knowing that Defendant John had various inconsistent and irreconcilable financial and membership documents and concealing the improprieties from Dougherty;

   d.  preparing at least two fraudulent valuations of Rubicon which these Defendants knew was going to be used by Defendant John to defraud Dougherty and others;

   e.  preparing fraudulent tax returns wherein Defendant Richars knew that Rubicon's books of account contained false, incorrect and/or misleading information; and

   f.  preparing fraudulent K-1 Schedules including for an individual and entity which were not members of Rubicon.

473.     The Defendants' acts and omissions alleged in this count constitute aiding and abetting fraud.

474.     As a result of these Defendants' acts and omissions, Dougherty has suffered damages.

475.     Dougherty also demands punitive damages for Defendants' willful and malicious conduct.

**WHEREFORE**, Plaintiff, Kevin Dougherty, demands a judgment for damages against Defendants MUELLER PROST PC, WIPFLI FINANCIAL ADVISORS LLP, and GRANT COLE CPA LLC for the full amount of his actual damages, punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.


## COUNT VII - CIVIL CONSPIRACY

*Against John Totsch, Terry Richars, Mueller Prost PC, Wipfli Financial Advisors LLP, Grant Cole CPA LLC, Curtis Neal Foster, Intense Fishing LLC, and Foster's Marine LLC*

476.     Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

477.     This is an action for civil conspiracy against Defendants JOHN TOTSCH, TERRY RICHARS, MUELLER PROST PC, its successors in interest, GRANT COLE CPA LLC, CURTIS NEAL FOSTER, INTENSE FISHING LLC, and FOSTER'S MARINE LLC arising out of the fraud committed against Dougherty ("Civil Conspiracy Defendants").

478.     The Civil Conspiracy Defendants conspired together to perpetrate unlawful acts upon Dougherty, or to perpetrate a lawful act by unlawful means, to wit: to defraud Dougherty out of hundreds of thousands of dollars and to conceal their fraud from Dougherty.

479.     The Civil Conspiracy Defendants had actual or constructive knowledge of the schemes to defraud Dougherty, and the Civil Conspiracy Defendants were aware that they were playing a vital role in the success and maintenance/expansion of the fraud against Dougherty.

480.     As a direct and proximate result of the Civil Conspiracy Defendants' participation in, and in furtherance of, the conspiracy, Dougherty has suffered damages and ongoing interference with his intellectual property rights.

481.     Defendant Wipfli, as the successor in interest to Defendant Mueller Prost and/or other successors in interest to Mueller Prost, is/are liable for damages to Dougherty caused by Defendant Mueller Prost's participation in the Civil Conspiracy.

482.     Dougherty demands punitive damages for Defendants malicious and willful conduct.

**WHEREFORE**, Plaintiff, Kevin Dougherty, demands a judgment for damages against Defendants JOHN TOTSCH, TERRY RICHARS, MUELLER PROST PC, WIPFLI FINANCIAL ADVISORS LLP, GRANT COLE CPA LLC, CURTIS NEAL FOSTER, INTENSE FISHING LLC, and FOSTER'S MARINE LLC for the full amount of his actual damages, punitive damages, pre-judgment and post-judgment interest, and such other and further relief as the Court deems just and proper.

## COUNT VIII - FRAUDULENT TRANSFER SEEKING, INTER ALIA, APPOINTMENT OF A SPECIAL MASTER OR RECEIVER AND INJUNCTION (§726.108, Fla. Stat.)

*Against Intense Fishing LLC, Foster's Marine LLC, John Totsch, Richard Totsch, and John Doe(s)*

483.     Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

484.     This is an action for equitable and other relief pursuant to the Florida Uniform Fraudulent Transfer Act, Florida Statute §726.101 *et. seq.*, against fraudulent transferees INTENSE FISHING LLC, FOSTER'S MARINE LLC, JOHN TOTSCH, RICHARD TOTSCH, and JOHN DOE(S) ("Fraudulent Transferee Defendants").

485.     Dougherty is a creditor of Rubicon as the lender on the promissory note and other loans.

486.     From 2014 through present, Defendant John facilitated fraudulent transfers of monies *through Rubicon* to the Fraudulent Transferee Defendants.

487.     These transfers were made when Rubicon was insolvent because its debts to Dougherty far exceeded its ability to pay and/or the transfers were made without adequate compensation.

488.     The transfers were made by and to Fraudulent Transferee Defendants, as insiders, with the actual intent to hinder, delay or defraud Dougherty, a creditor.

489.     The same constitutes a fraudulent transfer in violation of Florida Statute §726.105(1)(a).

490.     Further, the debtor, Rubicon, did not receive reasonably equivalent value for the transfer and intended to incur – or believed or reasonably should have believed that it would incur – debts beyond its ability to pay as they become due, and thus the transfers at issue are in violation of §726.105(1)(b).  As such, Dougherty is entitled to relief under §726.108.

491.     Among other transfers, Defendant John fraudulently transferred money from Rubicon to purchase real property in the name of Rubicon and subsequently transferred said real property to the Maddy Burke Revocable Trust, of which John is the trustee and his grand-daughter is the purported beneficiary. This transfer was made to shield the ill-gotten property from Dougherty's reach.

492.     Defendant John fraudulently transferred money from Rubicon to presently unknown parties John Doe(s).

493.     Dougherty lacks an adequate remedy at law because, unless the relief sought in this count is granted, Rubicon and John will have succeeded in fraudulently transferring assets beyond the reach of Dougherty to the Fraudulent Transferee Defendants.

494.     Dougherty seeks all remedies available under chapter 726 including, but not limited

to, the following: (a) avoidance of the transfers; (b) an attachment or other provisional remedy against the transferred property in accordance with applicable law; (c) an injunction against further disposition of the property; (d) appointment of a Special Master or receiver to take charge of the transferred assets and proceeds; (e) any other relief as the circumstances may require.

495.    Dougherty demands all damages and remedies under the law against the fraudulent transferees.

**WHEREFORE,** Plaintiff, Kevin Dougherty, demands judgment against Defendants INTENSE FISHING LLC, FOSTER'S MARINE LLC, JOHN TOTSCH, RICHARD TOTSCH, and JOHN DOE(S) for compensatory damages; pre-judgment and post-judgment interest; an order voiding all fraudulent transfers; granting Dougherty's Expedited Motion for Preliminary Injunction being filed contemporaneously herewith and providing for an injunction against any further disposition or assignment of any money or property purportedly owned by Rubicon Products LLC and/or John Totsch; appointment of a Special Master to take charge of the fraudulently transferred assets of Rubicon Products LLC; and an award of Dougherty's attorney's fees and costs for bringing this action; and for such other further relief this Court deems just and proper.

## COUNT IX - NEGLIGENCE

### *Against Mueller Prost PC, Wipfli Financial Advisors LLP, and Grant Cole CPA LLC*

496.    Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

497.    This is an action for Negligence against Defendants MUELLER PROST PC, and GRANT COLE CPA LLC. ("Negligence Defendants").

498.    Defendants Mueller Prost and Grant Cole owed a duty of care to Dougherty, and the Negligence Defendants knew that Dougherty reasonably believed that the Negligence Defendants were acting in Dougherty's best interests aside from those duties owed to Rubicon.

499.     Defendant Wipfli acquired Defendant Mueller Prost in June 2021 and, upon information and belief, all claims that existed prior to that date against Mueller Prost are actionable against Defendant Wipfli as the successor in interest to Mueller Prost, including Negligence committed by Richars and Mueller Prost as alleged herein.

500.     Defendants Mueller Prost and Grant Cole's conduct fell below the standard of care that they owed to Dougherty by, *inter alia,* (1) preparing and emailing knowingly false documents that misrepresented Dougherty's interest in Rubicon; (2) concealing from Dougherty, Defendant John's improper use of Dougherty's funds loaned to Rubicon; (3) conducting bookkeeping for Rubicon, knowing that Defendant John had various inconsistent and irreconcilable financial and membership documents and concealing the improprieties from Dougherty; (4) preparing at least two fraudulent valuations of Rubicon which the Negligence Defendants knew that Defendant John would use to defraud Dougherty and others; (5) preparing fraudulent tax returns wherein Defendant Richars knew that Rubicon's books of account contained false, incorrect and/or misleading information; (6) preparing fraudulent K-1 Schedules including an individual and entity which were not members of Rubicon; and (7) operating a short-term, high interest lending company that took advantage of distressed clients and their individual principals despite conflicts of interest.

501.     As a result of the Negligence Defendants' acts and omissions, Dougherty has suffered damages.

502.     These entity Defendants are liable for the acts of their employees who perpetrated these acts and omissions pursuant to respondent superior or vicarious liability.

503.     Dougherty discovered the Negligence Defendants' breaches alleged herein in or about November 2021.

**WHEREFORE**, Plaintiff, Kevin Dougherty, demands judgment for damages against Defendants MUELLER PROST PC, WIPFLI FINANCIAL ADVISORS LLP, and GRANT COLE

CPA LLC for the full amount of his actual damages, pre-judgment and post-judgment interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT X - TEMPORARY AND PERMANENT INJUNCTION

### *Against John Totsch, Richard Totsch, Curtis Neal Foster, Intense Fishing LLC, and Foster's Marine LLC*

504.　　Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

505.　　This is an action for a temporary and permanent injunction against JOHN TOTSCH, RICHARD TOTSCH, CURTIS NEAL FOSTER, INTENSE FISHING LLC, and FOSTER'S MARINE LLC ("Injunction Defendants").

506.　　Dougherty seeks an Injunction:

 a.　Granting Dougherty exclusive control of Rubicon's bank accounts, books, records, websites, vendor contracts, "Watec" contract, online accounts of any kind and/or intangible property, to the exclusion of the Injunction Defendants and any other party identified herein, and requiring Injunction Defendants to facilitate Dougherty's account access;

 b.　Prohibiting the Injunction Defendants, directly or indirectly, from taking any action relating to or on behalf of Rubicon, including accessing any of the items noted in (a) above, including Rubicon's bank accounts, without a court order;

 c.　Requiring Injunction Defendants to transfer or assign the Watec Agreement to Rubicon;

 d.　Requiring the Injunction Defendants to execute a patent assignment to restore the subject patent to Dougherty;

 e.　Requiring John to execute a deed transferring the land held by the Maddy Burke Revocable Trust to Dougherty;

      f.   Prohibiting these Defendants from receiving any funds, directly or indirectly, from Rubicon.

      g.   Appointing a Special Master or Receiver to facilitate Defendants' compliance with the foregoing.

507.    Dougherty has and continues to suffer ongoing irreparable harm due to the ongoing fraudulent conduct of the Injunction Defendants such that the ongoing harm will continue unless temporary and permanent injunctive relief is entered by the Court.

508.    Dougherty is likely to succeed on the merits of his claims because the fraudulent conduct of Injunction Defendants is brazen, ongoing, documented, and has caused Dougherty ongoing harm and losses, aside from the damage caused to Rubicon.

509.    Dougherty has no adequate remedy at law in that Dougherty's interest in Rubicon, and Rubicon's viability, and Dougherty's ownership of the patent depend on the Court entering an injunction; only the entry of an injunction can afford Dougherty full, complete, and adequate relief under these circumstances where the Defendants' brazen acts of fraud continue unabated and are likely to continue without a court order.

WHEREFORE, Plaintiff, Kevin Dougherty, requests that the Court enter temporary and permanent injunctive relief against JOHN TOTSCH, RICHARD TOTSCH, CURTIS NEAL FOSTER, INTENSE FISHING LLC, and FOSTER'S MARINE LLC ("Injunction Defendants").

      a.   Granting Dougherty exclusive control of Rubicon's bank accounts, books, records, websites, online accounts of any kind and/or intangible property, to the exclusion of the Injunction Defendants and any other party identified herein, and requiring Injunction Defendants to facilitate Dougherty's account access;

b.  Prohibiting the Injunction Defendants, directly or indirectly, from taking any action relating to or on behalf of Rubicon, including accessing any of the items listed above in (a) without a court order;

c.  Requiring Injunction Defendants to transfer or assign the Watec Agreement to Rubicon;

d.  Requiring the Injunction Defendants to execute any and all patent assignments required to restore all of Rubicon's intellectual property to Dougherty;

e.  Requiring John to execute a deed transferring the land held by the Maddy Burke Revocable Trust to Dougherty and precluding John from transferring the land without court order;

f.  Prohibiting these Defendants from receiving any funds, directly or indirectly, from Rubicon;

g.  Appointing a Special Master or Receiver to facilitate Defendants' compliance with all matters herein.

h.  Entering any further order appropriate under the circumstances;

i.  Enter an award of costs, and such other relief the Court deems just and proper.

### COUNT XI - EMERGENCY APPOINTMENT OF A SPECIAL MASTER

***Against John Totsch, Richard Totsch, Curtis Neal Foster, and Rubicon Products LLC***

510.    Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

511.    Dougherty requests on an emergency basis that this Court appoint a Special Master to manage and/or protect the property, business, assets, and affairs of Rubicon, as well as the property of Rubicon held in the Maddy Burke Revocable Trust, pursuant to common law and/or as a fraudulent transfer remedy under section 726.108, Florida Statutes.

512.     Nothing short of the appointment of a Special Master will stop the Defendants from continuing to perpetrate fraud and misconduct and to profit from same, all at the expense of Dougherty and Rubicon.

513.     Dougherty further requests that the Special Master perform a full accounting of all property and assets that Rubicon owns or controls or should own (but for these Defendants' misconduct), for the five (5) years preceding this request. Dougherty further requests that the Special Master safeguard the Maddy Burke Revocable Trust Property from further transfers at the direction of Defendant John.

514.     Dougherty has legal and equitable claims to the property, assets, and income of Rubicon.

515.     Defendants John, R. Totsch, and Foster currently control the business, operations, and affairs of Rubicon, and they have wrongly excluded Dougherty and taken all Rubicon's earnings for themselves without repaying Dougherty what he is owed.

516.     As described herein, Defendants John, R. Totsch and Foster have committed and are currently committing fraud, waste, and mismanagement of Rubicon to the point that none of the financial records of Rubicon are irreconcilable, governing documents (the operating agreement) is a sham designed to create the appearance of legitimacy, Rubicon has been pilfered of its assets, and these Defendants have and continue to exploit Rubicon for personal gain.  These Defendants raid Rubicon's accounts to fund their lifestyle without regard to Dougherty's rights and the proper operation of Rubicon.

517.     Given these Defendants' brazen acts of fraud perpetrated against Dougherty, which are ongoing, there is a serious and imminent threat that these Defendant may continue to remove, dissipate, transfer or divert Rubicon's remaining assets for wrongful purposes, at the expense of Rubicon and Dougherty.

518.    Further, there is a serious and imminent threat that these Defendants may destroy or conceal accounting records, financial records, communications, emails, and other documents of or relating to Rubicon that could demonstrate a pattern of illegal activity.

519.    There is no remedy at law or in equity that is adequate to protect Dougherty's interest in Rubicon and Rubicon's continued operations as these Defendants have and continue to exhibit a brazen willingness to defraud.

520.    The appointment of a Special Master is necessary and appropriate pursuant to Rule 53 as there is a need to address pretrial matters (Defendants' fraud and concealment) that cannot be effectively and timely addressed by the Court given the extensive web of fraud, transfers, and unknown acts of misconduct that are believed to be still occurring.

521.    A Special Master is needed immediately to protect Dougherty from the misconduct of Defendants, and further waste, loss, substantial diminishment in value, dissipation, impairment, and additional fraudulent transfers.

522.    Dougherty is likely to succeed on the merits of his claims because the fraudulent conduct of Injunction Defendants is brazen, ongoing, documented, and has caused Dougherty ongoing harm and losses, aside from the damage caused to Rubicon.

523.    The appointed receiver should be paid by Defendant John, whose pilfering of Rubicon and fraud has necessitated the appointment of a receiver.

524.    Dougherty requests that this Court appoint an independent, disinterested third party to serve as receiver of Rubicon and grant the Receiver all powers necessary and appropriate.

**WHEREFORE**, Plaintiff, Kevin Dougherty, respectfully requests that this Court: immediately appoint a Special Master or receiver of Rubicon; order the receiver to take immediate control Rubicon and exclude Defendants from accessing or exerting any control over Rubicon; to account for and manage and protect its property, business, assets, and affairs; order that the receiver's

fees be paid by Defendant John Totsch; and order any such other relief as this Court deems just and proper.

### COUNT XII - TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

*Against Curtis Neal Foster, Intense Fishing LLC, and Foster's Marine LLC*

525.     Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

526.     This is an action for tortious interference with a business or prospective business relationship against CURTIS NEAL FOSTER, INTENSE FISHING LLC, and FOSTER'S MARINE LLC ("Tortious Interference Defendants").

527.     Dougherty invested his time and resources into locating prospective purchasers of the Nite Track device.  Dougherty researched prospective purchasers, attended events, and ultimately cultivated business relationships with prospective purchasers located in the Miami, Florida area.

528.     These business relationships were with, among others, Renaissance Prowler and Invincible Boats ("Business Relationships").

529.     These Business Relationships were personal to Dougherty as he personally cultivated the relationships and stood to earn a sales commission for all sales of the Nite Track device that he generated.  The Business Relationships did not belong to Rubicon.

530.     The Tortious Interference Defendants were not parties to Dougherty's Business Relationships and had no right to interfere with these Business Relationships.

531.     The Tortious Interference Defendants learned of Dougherty's Business Relationships.

532.     Thereafter, the Tortious Interference Defendants together intentionally and unjustifiably interfered with Dougherty's Business Relationships by surreptitiously intervening in these relationships, cutting out Dougherty, and completing sales of the Nite Track device then pocketing the proceeds and sales commissions for themselves.

533.    The Tortious Interference Defendants acted improperly and without privilege as they breached Dougherty's business relationships by usurping Dougherty's long-cultivated relationships.

534.    As a proximate result of these Defendants' conduct, Dougherty has suffered and continues to suffer damages, including loss of business and lost profits.

**WHEREFORE**, Plaintiff, Kevin Dougherty, demands judgment against Defendants CURTIS NEAL FOSTER, INTENSE FISHING LLC, and FOSTER'S MARINE LLC for the full amount of his actual damages, pre-judgment and post-judgment interest, punitive damages, costs, and such other and further relief as the Court deems just and proper.

## COUNT XIII - BREACH OF CONTRACT, OR IN THE ALTERNATIVE, FORECLOSURE OF SECURITY INTEREST

### *Against John Totsch and Rubicon Products LLC*

535.    Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

536.    This is an action against Defendants JOHN TOTSCH and RUBICON PRODUCTS LLC for breach of contract, or in the alternative, foreclosure of a security interest.

537.    Defendant John executed and delivered a Promissory Note to Dougherty, in the amount of $200,000.00, attached hereto.

538.    Payment of the note is secured by a 40% interest in Rubicon.

539.    Defendant John, *and not Rubicon*, is the real obligor on the note, because though he signed the on behalf of Rubicon, he is the only party with a 40% interest in Rubicon who could secure the note.

540.    Further, Defendant John facilitated the preparation of the note and took the proceeds of the note for his own personal use.

541.    Thus, Dougherty and John, through Rubicon entered into the Note whereby Dougherty provided $200,000.00 in exchange for a security interest in John's 40% interest in Rubicon.

542.     John individually or through Rubicon defaulted on his repayment obligations and made no payments on the Note.

543.     Due to the default, Dougherty accelerates all of the indebtedness owed, and the entire principal amount due, plus 10% annual interest, attorney's fees, and costs of collection, which are now immediately due and payable.

544.     John and Rubicon breached the terms of the Note by failing to may any payments and Dougherty has elected to declare payments of the balance due immediately.

545.     John and Rubicon owe Dougherty the principal amount of $200,000.00 plus attorney's fees, costs, and interest.

546.     In the alternative, Dougherty forecloses on his 40% security interest in Defendant John's membership interest in Rubicon, which is located in the State of Florida and described in the Note.

547.     Dougherty has perfected his interest and complied with governing law such that foreclosure on Defendant John's 40% interest is proper.

**WHEREFORE**, Plaintiff, Kevin Dougherty, demands judgment against JOHN TOTSCH and RUBICON PRODUCTS LLC for all sums due under the Note, together with interest, costs, attorney's fees, and in the alternative, possession of Defendant John's 40% interest in Rubicon, costs, and all further relief this Court deems just and proper.

## COUNT XIV - EQUITABLE ACCOUNTING

*Against John Totsch, Curtis Neal Foster, Intense Fishing LLC, Foster's Marine LLC, and Rubicon Products LLC*

548.     Dougherty realleges Paragraphs numbers 1 through 382 as if fully set forth herein.

549.     This is an action for an equitable accounting against JOHN TOTSCH, CURTIS NEAL FOSTER, INTENSE FISHING LLC, FOSTER'S MARINE LLC, and RUBICON PRODUCTS LLC.

550.    The contracts and transactions between the parties, involving Rubicon's operations, are complex as they involve many parties, transferees, and questionable record keeping practices. Further, Defendants have concealed many records from Dougherty, including Nite Track sales records.

551.    Dougherty has an ownership interest in Rubicon as majority shareholder.

552.    Dougherty has an interest in all monies that he invested in Rubicon and loaned to Rubicon as evidenced by the promissory note documenting these loans.

553.    The contract demands between Dougherty and Defendants require calculating the value of Rubicon, which necessarily involves extensive and complicated accounts.

554.    Dougherty is dependent upon Defendants to provide him with a calculation of the value of Rubicon including sales, profits, expenses, debts, and other financial and accounting information.

555.    It is not clear that a remedy at law is as full, adequate, and expeditious as it is in equity.

556.    Specifically, a remedy at law would be inadequate because Dougherty has no way of calculating the damages to which he is entitled due to these Defendants' ongoing fraud, surreptitious transfers to unknown entities, and takeover of Rubicon's accounts and records to the exclusion of Dougherty.

557.    The circumstances are such that Dougherty has a need for an equitable accounting and would be severely prejudiced if same were not granted.

**WHEREFORE**, Plaintiff, Kevin Dougherty, demands judgment against JOHN TOTSCH, CURTIS NEAL FOSTER, INTENSE FISHING LLC, FOSTER'S MARINE LLC, and RUBICON PRODUCTS LLC, ordering that these Defendants be required to provide Dougherty with an equitable accounting at their own cost, to be performed by a third-party auditor; an award of compensatory

damages, pre-judgment and post-judgment interest, costs; and such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Dougherty demands trial by jury on all issues so triable.

Respectfully submitted on July 5, 2023.

**FARROW LAW, P.A.**
*Attorneys for Plaintiff*
1 Alhambra Plaza, Ph Floor
Coral Gables, Florida 33134
Telephone: (954) 252-9818
jay@farrowlawfirm.com
service@farrowlawfirm.com

BY: **/s/Jay L. Farrow**
JAY L. FARROW, ESQ.
Florida Bar Number: 625213